#24932-DG
**2009 SD 9**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE DISCIPLINE

OF MICHAEL P. REYNOLDS,

as an Attorney at Law.

* * * *

ORIGINAL PROCEEDING

* * * *

MICHAEL C. LOOS
Clayborne, Loos, Strommen & Sabers, LLP
Rapid City, South Dakota                    Attorney for respondent.

ROBERT B. FRIEBERG                          Counsel for disciplinary
Beresford, South Dakota                     board.

* * * *

ARGUED
August 28, 2008

OPINION FILED 2/11/09

#24932

GILBERTSON, Chief Justice

[¶1.] The Disciplinary Board of the State Bar of South Dakota (Disciplinary Board) filed a formal accusation against Michael P. Reynolds (Reynolds), a member of the State Bar of South Dakota. Reynolds failed to answer the formal accusation within thirty days. SDCL 16-19-68.[1] The Disciplinary Board also filed a petition for an order temporarily suspending Reynolds from the practice of law. Reynolds failed to respond to the petition for temporary suspension. SDCL 16-19-35.1[2].

[¶2.] On July 25, 2008, this Court granted the petition for temporary suspension and ordered Reynolds to appear before the Court on August 28, 2008, to show cause why he should not be permanently disbarred from the practice of law. This Court did not receive any communication from Reynolds until August 22, 2008, when his attorney filed a notice of appearance.

[¶3.] Two weeks after oral argument before this Court, Reynolds filed a motion for leave to file a response to findings of fact, conclusions of law and formal accusation. The Disciplinary Board filed a response. This Court denied the motion.

[¶4.] Accordingly, this Court has proceeded to "render such judgment as the case requires" SDCL 16-19-68, and has concluded that the appropriate sanction in this case is a three-year suspension from the practice of law. SDCL 16-19-35(2).

---

1.   SDCL 16-19-68 provides, in part, "The accused attorney shall answer the formal accusation within thirty days and admit or deny the allegations therein[.] . . . If the accused attorney admits the allegations or fails to answer the formal accusation, the court shall proceed to render such judgment as the case requires."

2.   16-19-35.1 provides, in part, "The respondent attorney *shall* file with the Supreme Court, a response within ten days of service and serve a copy of the response on the board or board counsel." (emphasis added).

Following the three-year suspension, Reynolds may petition for reinstatement. SDCL 16-19-83 - 16-19-87.

## GENERAL BACKGROUND

[¶5.] Reynolds was raised in Sioux Falls and graduated from Washington High School in 1980. He graduated from Northwestern University in Chicago, Illinois, in 1984 with a B.S. in communication studies and a B.A. in political science. Reynolds attended the University of California at Los Angeles (UCLA) School of Law and interned for a semester with the chairman of the Federal Communications Commission. After graduation in 1987 he exclusively practiced commercial litigation with the Winston and Strawn law firm in Chicago except for a six month hiatus with another firm, Skadden Arps.

[¶6.] When Reynolds and his wife had their first child in 1990 they began contemplating returning to their native South Dakota. Before starting his job search in South Dakota, Reynolds passed the July 1993 South Dakota bar examination and was admitted to the practice of law in South Dakota on February 22, 1994.

[¶7.] Reynolds began working in the Quinn, Eisland, Day & Barker law firm on September 22, 1994, and remained with the firm when it became Quinn, Day & Barker in 1998. In 2001 Wilson, Reynolds & Burke was formed. Throughout this time Reynolds' practice focused on commercial litigation, primarily partnership, shareholder and employment disputes. Reynolds maintained between 65 to 80 active files. He worked from 7:00 a.m. to 7:00 p.m., went home until his children were in bed, and returned to the office until 2:00 a.m.

[¶8.]        In 2006 Reynolds became President and Chief Executive Officer with Dunbar Enterprises, LLC.  He maintained an "of counsel" position with the Barker Reynolds firm and continued working with two other clients.  In 2007 Reynolds' practice was limited to Dunbar Enterprises, LLC only.

[¶9.]        In the course of his practice Reynolds has done a significant amount of pro bono work.  He has been a speaker at State Bar CLEs.  He has served on the boards of the United Way, Black Hills Symphony, Junior Achievement, Black Hills Community Theatre and the Tatanka Foundation.  Reynolds was also the president of his church council for four years.  Reynolds never missed his children's activities.

A.

[¶10.]        On June 18, 2001, J.W., who held a management position with the City of Rapid City, was given the option to resign with a severance package or be suspended from his duties until the Rushmore Plaza Civic Center Board could meet to consider the Rapid City Mayor's request that J.W. be terminated from his position.  J.W. chose the former.

[¶11.]        Within days of what he considered a "forced resignation," J.W. retained Reynolds to represent him and wrote to city officials in an attempt to initiate the city's non-union personnel grievance procedure.  The city advised J.W. that although he was not entitled to the grievance procedure the city would, as a courtesy, meet with him and his legal counsel to discuss J.W.'s performance problems and its concerns "regarding those events leading up to your resignation."

[¶12.]        By letter dated July 10, 2001, Reynolds advised J.W. that:

> we should take the position that since your resignation
> was forced, the grievance provisions are triggered.  I

informed you when we talked that this would be a dicey issue, and one that could be the death-knell of any potential litigation. However, I think we need to give it the "old college try."

[¶13.] Reynolds and J.W. did meet with city officials. On August 28, 2001, the mayor wrote to Reynolds, told Reynolds that he had considered the request to reinstate J.W., and could not recommend that J.W. be allowed to revoke his resignation. On August 30, 2001, Reynolds wrote to J.W. and told him to call Reynolds so they could discuss the "next move."

[¶14.] For the next few months J.W., who had been in almost daily contact with Reynolds, focused on filing for unemployment insurance and searching for a new job. He secured a job in Wisconsin and moved on March 29, 2002. The day before he moved J.W. met with Reynolds and agreed on a contingent fee. According to J.W., Reynolds agreed to prepare a complaint and forward it to J.W. for review.

[¶15.] For the next two years J.W. attempted to communicate with Reynolds about the status of his case, the drafting of the complaint, and the statute of limitations through phone calls, faxes, and frequent e-mails which Reynolds, for the most part, did not answer. Due to Reynolds' failure to respond the tone of J.W.'s e-mails became increasingly desperate for information on the status of his case.

[¶16.] On March 4, 2004, almost two years after J.W. moved to Wisconsin, Reynolds responded to J.W.'s e-mail of the same day. Reynolds told J.W. that he was in talks with the city and would send a draft complaint at the end of the week. When that did not happen, J.W. continued to e-mail Reynolds and Reynolds responded that he was working on the complaint.

[¶17.]     J.W. returned to Rapid City on May 28, 2004, and met in person with Reynolds who was apologetic, took responsibility for not communicating, and agreed to prepare a complaint. Reynolds e-mailed the complaint to J.W. on May 31, 2004.

[¶18.]     J.W. e-mailed Reynolds on June 1, 2004, expressing his pleasure with the complaint and asking questions about it. In a series of unanswered e-mails throughout June 2004, J.W. attempted to find out if the complaint had been filed. Reynolds ultimately responded on June 23, 2004:

> I will respond to no more e-mails of this nature. This is neither positive nor productive.
>
> I drafted the complaint, I made your changes. Filing is in the pipeline. I'm peddling as fast as I possibly can.
>
> Perhaps we should find you an attorney that is more attentive to your needs.

[¶19.]     Throughout the rest of 2004 J.W. continued to e-mail and call Reynolds regarding the status of filing the complaint and whether Reynolds was representing him. On March 12, 2005, after Reynolds did not respond to any of J.W.'s communications, J.W. filed a formal complaint with the Disciplinary Board.

[¶20.]     At the Disciplinary Board's hearing on September 22, 2005, Reynolds acknowledged that the complaint had never been filed and that a statute of limitations had expired. He admitted that his communication with J.W. was poor and the situation could have been avoided by better communication, honesty about the viability of J.W.'s claims, and the sending of a disengagement letter. Reynolds also admitted that during the time of his representation of J.W. he had also represented the City of Rapid City on two matters. Reynolds recognized the conflict

and failed to disclose the conflict to either client or receive permission from either to proceed.

[¶21.]     At the Disciplinary Board's hearing Reynolds was unable to articulate steps he could take to ensure that the situation with J.W. would not be repeated. Reynolds admitted that his life had no balance; he was overextended with his demanding legal caseload and "the pressures to produce," his family commitments, and his outside activities. While he did receive counseling for stress management and tried to implement what he had learned, he simply did not "have the answers" to solving his problems.

[¶22.]     Following the September 2005 Disciplinary Board hearing, Reynolds, his law partner, Michael A. Wilson, Disciplinary Board counsel Robert B. Frieberg, and Disciplinary Board member Thomas J. Nicholson, who was assigned to Reynolds' case, met in October 2005 to negotiate a Private 60 Agreement pursuant to SDCL 16-19-60, which provides:

> If it is determined after an investigation by the board that the complaint is meritorious, but that formal disciplinary proceedings are not warranted, the board and the attorney may agree in writing to hold the proceedings in abeyance for a definite period, provided the attorney throughout the period complies with specified reasonable conditions. Upon satisfactory compliance, the board may thereafter dismiss the proceedings and notify the complainant and such other persons as the board deems appropriate. If, after an investigation, the attorney general finds such action warranted, he shall report his findings to the Supreme Court and recommend that such action be taken by the board.

[¶23.]     In the Private 60 Agreement Reynolds admitted that he violated Rules 1.3, 1.4, 1.5, 1.7, and 8.4(a)(c) of the South Dakota Rules of Professional Conduct by

#24932

failing to respond to a client's numerous requests regarding the status of a case, neglecting the client's file and allowing the statute of limitations to expire without informing the client, and failing to seek permission from clients whose interests were potentially adverse with respect to an apparent conflict of interest. The Disciplinary Board and Reynolds agreed that the disciplinary proceeding would be held in abeyance from December 1, 2005, until November 30, 2008, provided Reynolds complied with specified reasonable conditions. These conditions included:

- a mental health evaluation to assess whether Reynolds suffered from a disorder which impaired his ability to practice law, and treatment, if necessary;

- a review of all Reynolds' files by Reynolds and Wilson, disengagement of matters of questionable merit and cases where there was a disagreement as to management of the case, fees and expenses as determined by Wilson, and, approval by Wilson to accept any new cases for a new or existing client;

- a biweekly review of every case or file by Reynolds to assure matters were not neglected and clients were informed;

- various reporting requirements to Wilson and the Disciplinary Board, and;

- the institution of formal disciplinary proceedings for a violation of the agreement or other complaints filed against Reynolds.

[¶24.]    Board counsel Frieberg mailed the Private 60 Agreement to Reynolds for his signature and that of Wilson on November 2, 2006. When Frieberg telephoned Reynolds three weeks later, Reynolds assured Frieberg that the agreement was on his desk, and it would get signed and returned. On December 21, 2006, the Disciplinary Board sent Reynolds, by certified mail, a notice of hearing

"with respect to your failure to respond to the Disciplinary Board concerning your agreement under SDCL 16-19-60." That same day Wilson signed the Private 60 Agreement and Reynolds mailed it to Frieberg with a handwritten note saying, "Sorry for the delay; a little miscommunication on this end."

[¶25.] At the January 5, 2006, due process hearing on the matter, the Disciplinary Board expressed its concern that either Reynolds was not taking the Private 60 Agreement seriously, or that he was exhibiting the same behavior that brought him before the Board initially: putting things aside and not getting back to them. The Board stressed the importance of following the agreement and scrupulously reporting and communicating his compliance with it to the entities required by the agreement.

[¶26.] Reynolds apologized to the Disciplinary Board, discussed the steps he had taken to implement the Private 60 Agreement, and assured the Disciplinary Board that he understood the seriousness of the agreement. The delay in returning the signed Private 60 Agreement, Reynolds said, was his inability to meet with his law partner, Wilson, to secure his signature. Reynolds explained, "So it's not as if I have tried to ignore this agreement in any way, shape or form. It was more in the nature of two ships passing in the night, Mike and I were, over the holidays, and I sincerely apologize."

B.

[¶27.] The Disciplinary Board held a "follow-up" hearing with Reynolds on June 20, 2006, to discuss amending the Private 60 Agreement. As of April 1, 2006, Reynolds' law firm had dissolved and Reynolds, with Disciplinary Board knowledge,

had signed a two-year contract with Dunbar Enterprises, LLC to become its President and Chief Executive Officer.

[¶28.]    Reynolds asked the Disciplinary Board to allow him to maintain an "Of Counsel" position with the Barker Reynolds Law Firm in order to periodically assist his former law firm and to use that firm's name on pleadings and correspondence in litigation involving Dunbar Enterprises.  Reynolds also asked the Disciplinary Board to allow him to continue to work with Epic Outdoor Advertising and the Sturgis Area Chamber of Commerce and to continue limited pro bono work.  His employer at Dunbar Enterprises, Kevin Costner, had already agreed to this request.

[¶29.]    Reynolds told the Disciplinary Board that this arrangement decreased his caseload from eighty complex cases to a maximum of six pieces of litigation for three entities with whom he had strong, passionate relationships and for whom he did "a great job."  In fact, Reynolds was office sharing with his client Epic Outdoor Advertising.  Reynolds told the Disciplinary Board that he was now only working from 8 a.m. to 5 p.m. Monday through Friday for very good compensation.  His stress level was down "300 percent," he lost 40 pounds by daily exercise, and he recently acted and sang in a community theater production of "Oklahoma."

[¶30.]    On July 24, 2006, Reynolds signed the Amended Private 60 Agreement.  In it, the Disciplinary Board approved his requests to work for Dunbar Enterprises, be "Of Counsel" with Barker Reynolds Law Firm, and continue working with Epic Outdoor Advertising and the Sturgis Area Chamber of Commerce.  The Disciplinary Board and Reynolds also agreed that:

> 1.    [Reynolds] will engage [Mentor] to serve as a mentor for the principal purpose of monitoring

> [Reynolds'] case load in an effort to ensure [Reynolds] does not become overburdened and over-committed;
>
> 2. In that regard, [Reynolds] will report to [Mentor] on a bi-monthly basis and provide [Mentor] with updated information relating to each matter currently being pursued by [Reynolds].
>
> 3. [Reynolds] will submit periodic reports to the Secretary of the Board (March 15th, June 15th, September 15th, December 15th), updating the Board as to his pending matters and certifying in writing that he is in compliance with the aforementioned conditions of this Amended Agreement, which report shall include [Mentor's] acknowledgement.
>
> 4. [Reynolds] will promptly report to the Secretary of the Board any disputes with clients, including claims or demands of clients concerning lack of communication, lack of diligence, or disagreements of any nature regarding fees.

## C.

[¶31.] On October 4, 2006, Reynolds' client E.G. filed a complaint with the Disciplinary Board. E.G., who had been a client of Reynolds since 1997, was concerned that the statute of limitations was going to expire and that Reynolds had not responded to a myriad of phone calls, voice mail messages, and e-mails that E.G. sent since Reynolds' firm had dissolved. In addition, Reynolds had never provided E.G. with a copy of his file. E.G. wrote, "I am at my wits end in trying to reach Mr. Reynolds."

[¶32.] Reynolds wrote to the Disciplinary Board and informed it that E.G.'s file was in his former firm's storage facility which he did not have access to. While

#24932

he met with E.G. frequently during his initial representation of E.G., Reynolds

claimed that he did not receive E.G's recent messages.

[¶33.]     The Disciplinary Board contacted Reynolds' mentor.  [Mentor] wrote to

Reynolds on November 8, 2006:

> This letter is in follow up to the voice mail I left at your
> office on Friday, November 3.  In that message, I asked
> you to make arrangements to contact [E.G.] and to set up
> a time to meet with him to answer the questions he raised
> in his letter to Tom Nicholson dated October 31, 2006.  I
> also have a copy of the letter [E.G.] wrote to you on
> October 31, 2006 suggesting a meeting, and I had asked
> that you advise when you were going to meet with him so
> that we could meet on Monday or Tuesday, November 6 or
> 7.  To date, I have not heard from you and I really need to
> hear from you.
>
> I want to emphasize that Tom Nicholson is quite adamant
> that you make arrangements to meet with [E.G.] face to
> face and answer the questions he is raising in his
> correspondence.  I am very concerned that you are putting
> yourself in a very difficult situation if you do not get this
> done immediately as the Board has stated that is what
> they want done.  They told me that and I have told you.
> You need to get this done and I need to know when you
> have a scheduled appointment with [E.G.].  It has to be
> done <u>immediately</u>.

[¶34.]     On December 13, 2006, the Disciplinary Board informed Reynolds that

it would conduct a due process hearing to "consider whether you have complied with

the terms of the Agreement, particularly with regard to disputes with your clients

and your cooperation with your mentor."

[¶35.]     The hearing was January 3, 2007.  Pursuant to a subpoena issued by

the Disciplinary Board, Reynolds appeared and produced E.G.'s sizeable file.

Reynolds explained that the day he received the subpoena he found the key to the

storage facility in his desk drawer and retrieved the file.  Reynolds had not spoken

to E.G. or given a copy of the file he retrieved from storage to E.G. because he did not feel it was appropriate during the pendency of the disciplinary matter. Reynolds admitted that he received [Mentor's] voice mail telling him to meet with E.G., but denied receiving [Mentor's] November 8, 2006, letter telling him what action was necessary. Reynolds also admitted receiving a couple voice mails from E.G. and said that he tried to call E.G. back. E.G.'s caller ID did not show calls from Reynolds. Reynolds, who had no administrative staff and travelled often, told the Disciplinary Board that since the J.W. matter he made it a policy to respond to all phone calls within forty-eight hours.

[¶36.] Reynolds told the Disciplinary Board that he would do anything to salvage the situation. When asked by a board member "What's your solution to this? How do you salvage this?" Reynolds responded, "The only thing I can suggest is give me another chance." He told the Disciplinary Board that E.G.'s complaint was devastating to him and he apologized to the Board. He told the Board, "I'm an Army of one right now doing my best on behalf of my boss and I think he would tell you I have done a superlative job and I'm a good lawyer." He denied having any underlying issues with illicit drugs or alcohol and did not think he had "any deep set psychological issues."

[¶37.] On March 27, 2007, the Disciplinary Board and Reynolds entered into a Second Amended Private 60 Agreement which was to be effective April 1, 2007 to March 31, 2010. This agreement provided, in part,

> WHEREAS, the Amended Agreement no longer is appropriate except insofar as [Reynolds] may continue to maintain his active membership while serving as full-time President and Chief Executive Officer of Dunbar

Enterprises, LLC, now therefore this Second Amended Agreement is entered into pursuant to SDCL 16-19-60:

1.      [Reynolds] will not engage in the practice of law on behalf of any individual person, firm, corporation or entity of any kind or description other than Dunbar Enterprises, LLC.

2.      [Reynolds] will promptly withdraw from the Barker Reynolds Law Firm and cause his name and designation as "of counsel" to be promptly removed from the firm letterhead.

3.      [Reynolds] will notify Epic Media and the Sturgis Area Chamber of Commerce, together with any other existing clients, that he is withdrawing as their counsel, will promptly deliver their files and records to them, and assist them in securing substitute counsel.

D.

[¶38.]      In April 2008 the Disciplinary Board became aware that Reynolds was appearing as counsel for the Sturgis Area Chamber of Commerce in a case pending before the United States District Court, Western Division. The Disciplinary Board wrote to Reynolds on April 2, 2008, and told him that his appearance violated the Second Amended Private 60 Agreement, and requested that he provide an explanation by April 16, 2008. Reynolds did not respond. He also did not respond to an April 18, 2008, letter from the Disciplinary Board seeking a response to the April 2, 2008, letter and advising Reynolds to reserve June 16, 17, and 18, 2008, for a due process hearing in Rapid City.

[¶39.]      On May 22, 2008, the Disciplinary Board, by certified mail, return receipt requested, notified Reynolds that it would hold a due process hearing on June 16, 2008. The return receipt was signed, but not dated. The signature is

illegible. It also included a Subpoena Duces Tecum commanding Reynolds to appear and to bring:

> All files and records concerning (1) Lisa Bryan Management v. Tatanka Foundation, Lawrence County, Fourth Judicial Circuit CIV 06-165 and (2) The Sturgis Area Chamber of Commerce v. Little Sturgis Rally and Races for Charity, Inc., US District Court, Western Division, Case No. 08-5024.

The Disciplinary Board requested the Tatanka Foundation file because it was aware that Reynolds represented the foundation in a circuit court case in which Reynolds had failed to respond to discovery requests or appear at hearings after notice. These failures led to a default judgment against Tatanka in excess of three quarters of a million dollars.

[¶40.] On June 6, 2008, Reynolds filed a response on behalf of the Sturgis Area Chamber of Commerce to the defendant's motion to dismiss for lack of personal jurisdiction in the United States District Court action.

[¶41.] Reynolds failed to appear at the June 16, 2008, due process hearing. At oral argument before this Court, Reynolds claimed that he did not receive the notice of hearing. Reynolds was in his office on June 16, 2008, and claimed that he would have attended the hearing if he had known about it. On July 14, 2008, this Court received and filed the Disciplinary Board's findings of fact, conclusions of law, recommendation and formal accusation. The findings of fact noted:

> 13. [Reynolds] neglects his files, fails to respond to clients, ignores the Board, refuses mentoring and guidance when offered, and displays disdain for the civil justice system, the rules of the legal profession, and common courtesy, which conduct brings into question the fairness of the legal system.

[¶42.]     The Disciplinary Board concluded:

CONCLUSIONS OF LAW

A.     [Reynolds] has violated the Rules of Professional Conduct, Rule 1.3 concerning diligence, Rule 1.4 concerning communication, Rule 1.5 concerning fees, Rule 1.7 concerning conflict of interest, and Rule 8.4(a)(c) concerning misconduct.

B.     [Reynolds] has failed to reply to inquiries of and citations to appear before the Disciplinary Board, see *In re* Rude, 221 NW2d 43 (SD 1974), Matter of Discipline of Keith A. Tidball, 503 NW2d 850 (SD 1993), and SDCL § 16-19-54.

C.     [Reynolds] has failed to comply with the terms and conditions of the Agreements voluntarily entered into with the Disciplinary Board pursuant to SDCL § 16-19-60.

D.     [Reynolds'] misconduct is aggravated by the following aggravating circumstances as set forth in ABA Standards for Imposing Lawyer Sanctions, American Bar Association, adopted by the House of Delegates, February 1986 and amended February 1992, Standard 9.2, to-wit:
      Prior disciplinary offenses
      Dishonest or selfish motive
      A pattern of misconduct
      Multiple offenses
      Bad faith
      Obstruction of the disciplinary process by intentionally failing to comply with orders of the disciplinary agency
      Deceptive practice during the disciplinary process
      Refusal to acknowledge wrongful nature of conduct
      Vulnerability of victims
      Substantial experience in the practice of law

[¶43.]     The Disciplinary Board recommended that Reynolds be disbarred. It also filed a petition for temporary suspension.

[¶44.] Reynolds failed to answer the formal accusation within the thirty days required by SDCL 16-19-68.[3] Reynolds also failed to file with this Court a response to the petition for temporary suspension within ten days of service as required by SDCL 16-19-35.1. This Court granted the petition for temporary suspension on July 25, 2008, and ordered Reynolds to appear before the Court on August 28, 2008, to show cause why he should not be disbarred.

E.

[¶45.] Following oral argument before this Court, the Disciplinary Board sent this Court the memorandum decision filed by Fourth Circuit Court Judge Warren G. Johnson on September 29, 2008, in Civ. 06-165, Lisa Bryan Management Company vs. Tatanka Foundation. The Disciplinary Board asked this Court to take

---

3. Approximately sixty days after being served with the Board's July 2, 2008, findings of fact, conclusions of law, recommendation, and formal accusation, thirty days after the time for answering had expired, and almost two weeks after this Court had concluded the August 28, 2008, disbarment proceeding, Reynolds untimely moved to answer the Board's findings, conclusions, and formal accusation. Reynolds failed to file a timely answer even though the Board's formal accusation specifically advised him that he had "thirty days in which to admit or deny the allegations of the formal accusation pursuant to SDCL 16-19-68." That statute provides, "[t]he accused attorney *shall* answer the formal accusation within thirty days and admit or deny the allegations therein. . ." (emphasis added). "The effect of the word 'shall' may be determined by the balance of the text of the statute or rule." Truman v. Griese, 2009 SD 8, ¶ 28, __NW2d__ (citing Discover Bank v. Stanley, 2008 SD 111, ¶ 21, 757 NW2d 756, 762) (citations omitted). The only triggering event to start the 30 days running is the formal accusation by the Board. Thus, under the definition of "shall" contained in SDCL 2-14-2.1, the time to answer expires at the end of the 30th day. The only discretion in SDCL 16-19-68 is that the Court may hear the matter itself or it "*may*" refer [the] matter for the taking of testimony and the making of findings and recommendations. Reynolds identified no legitimate argument how any attorney could misunderstand these provisions.

judicial notice of this public record. Reynolds did not object to the Disciplinary

Board's request.

[¶46.] The facts of the Tatanka case, as set forth by Judge Johnson are:

> Defendant (Tatanka) is a nonprofit South Dakota
> Corporation. Kevin Costner, Santa Barbara County,
> California has been its sole member and president since
> its incorporation on March 28, 2005. The other original
> directors were Timothy E. Hoctor, Ventura County,
> California, Lisa Bryan and Michael P. Reynolds. Bryan
> was also the company manager and Reynolds was also its
> resident agent and corporate counsel.
>
> In early October, 2005, Reynolds fired Bryan for alleged
> misappropriation of funds. Bryan retained Sioux Falls
> attorney, [Bryan's attorney], who commenced this action
> on behalf of Bryan and her management company. The
> complaint sought damages for breach of contract, tortuous
> interference with the contract, and infliction of emotional
> distress. Reynolds' answer [sic] on Tatanka's behalf,
> denied her claims and asserted various counterclaims for
> fraud, deceit, misrepresentation and breach of fiduciary
> duty. Reynolds served the pleading on March 31, 2006.
>
> In early 2006, Reynolds left the Barker Wilson law firm
> and began full time employment as chief operating officer
> of Dunbar Enterprises, which was headquartered at 403
> National Street, No. 1, in Rapid City. Although Reynolds'
> contract did not require him to provide legal services to
> Dunbar, Costner or Tatanka, he continued to represent
> Costner and his corporation in a dissolution proceeding
> involving the Midnight Star partnership.
>
> [Bryan's attorney] served various discovery requests,
> motions, notices of hearing and other documents to
> Reynolds at the Dunbar business address. Reynolds did
> not respond to any of the notices and made no further
> appearance on behalf of Tatanka. On March 29, 2007,
> this Court entered judgment by default against
> defendant. An evidentiary hearing was held in July, and
> on July 30, 2007, judgment in the total sum of $785,
> 828.20 was entered in favor of Bryan. The judgment also
> provided for joint and several liability of directors,
> Costner, Hoctor and Reynolds. [Bryan's Attorney] served

notice of entry of judgment on Reynolds at his Rapid City business address. Last October 22nd, a Pennington County Sheriff's deputy personally served several executions on Reynolds, which were returned unsatisfied.

Costner fired Reynolds in May, 2008. George Picard became treasurer, assistant secretary, general manager, and registered agent of Tatanka. His wife, Debra, was appointed secretary. Last June, Bryan's present counsel subpoenaed Mr. Picard for a debtor's examination.

On July 28, 2008, Tatanka moved, pursuant to SDCL § 15-6-60(b), to vacate the default judgment on grounds of mistake, surprise, and excusable neglect. Directors, Costner and Hoctor, moved to vacate that portion of the judgment imposing joint and several liability for Bryan's damage award. Said motion was granted and by order of September 11, 2008, the judgment was vacated as to the individual directors.

[¶47.] At issue in Tatanka was whether a corporate defendant is entitled to relief from judgment on grounds of inadvertence, excusable neglect, surprise, lack of notice or mistake where its corporate counsel, Reynolds, answered the complaint but wholly failed to participate further in the litigation or inform the other officers and directors of the lawsuit. The trial court, in granting Tatanka's motion to vacate the judgment noted:

Additionally, the record includes the deposition of Michael P. Reynolds, taken on August 15, 2008. In said deposition, Reynolds testified that he told Costner about the Bryan complaint and that they discussed the various counterclaims Tatanka would assert. Additionally, Reynolds denied any recollection of receiving the notices and other documents mailed to him by [Bryan's attorney]. He did, however, acknowledge that the documents were sent to the proper addresses.

This Court finds that Reynolds' deposition testimony is void of credibility. He testified that he informed Costner of the lawsuit, after he received the summons and complaint and prior to serving the answer and

counterclaim. The Court finds it notable; [sic] that Reynolds' periodic reports to Grigsby, in which he describes the status and progress of all Costner's various Deadwood area enterprises, makes absolutely no reference to this suit. Reynolds' testimony that he received none of the notices sent by [Bryan's attorney] can only be viewed as false. The proposition that Reynolds failed to receive notice from [Bryan's attorney] when [Bryan's attorney] used the same mailing address as the Canevas' attorneys in the Midnight Star litigation which proceeded contemporaneously with the Bryan lawsuit defies logic.

## STANDARD OF REVIEW

[¶48.] This Court gives careful, due consideration to the Disciplinary Board's findings of fact because the Disciplinary Board had the advantage of seeing and hearing the witnesses first hand. In re Arendt, 2004 SD 83, 684 NW2d 79. We do not, however, defer to the Disciplinary Board's recommended sanction. Discipline of Ortner, 2005 SD 83, 699 NW2d 865. "The final determination for the appropriate discipline of a member of the State Bar rests firmly with the wisdom of this Court." Matter of Discipline of Wehde, 517 NW2d 132, 133 (SD 1994).

## DISCIPLINARY GOALS

[¶49.] "A certificate of admission to the bar is a pilot's license which authorizes its possessor to assume full control of important affairs of others and to guide and safeguard them when, without such assistance, they would be helpless." In re Egan, 52 SD 394, 402, 218 NW 1, 4 (1928)(quoting In re Kerl, 32 Idaho 737, 188 P 40 (1920). It is also:

a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court. It is the duty of every recipient of that privilege to conduct himself at all

times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.

SDCL 16-19-31. We take this obligation most seriously.

[¶50.]    This Court has an affirmative duty to discipline members of the bar. SDConst art V, § 12. The attorney disciplinary process is intended to a) protect the public from further fraudulent, unethical or incompetent activities involving the lawyer; b) preserve the image and integrity of attorneys, the bar association and the legal profession as a whole; and, c) deter like conduct by other attorneys. Discipline of Eicher, 2003 SD 40, 661 NW2d 354. Its purpose is not to punish the attorney. Petition of Pier, 1997 SD 23, 561 NW2d 297.

> The preservation of trust in the legal profession is essential. *Pier*, 1997 SD 23 at ¶ 8, 561 NW2d at 299. Lawyers in the practice of law have a formidable responsibility to protect their clients' "property, their freedom, and at times their very lives." Matter of Chamley, 349 NW2d 56, 58 (SD 1984). "Only by providing high quality lawyering can the integrity of the legal profession remain inveterate and the confidence of the public and the Bar remain strong." *Wehde*, 517 NW2d at 133.

In re Discipline of Mattson, 2002 SD 112, ¶ 40, 651 NW2d 278, 286.

ANALYSIS

[¶51.]    To practice law in South Dakota, an attorney must possess "good moral character." SDCL 16-16-2. Such a term goes well beyond that of honesty. Pursuant to SDCL 16-16-2.1 the term includes "honesty, candor, trustworthiness, diligence, reliability, observance of fiduciary and financial responsibility and respect for the rights of others and the judicial process." This is a continual and on-going

obligation. "Each day of an attorney's life demands that these requirements be met anew." *In re* Discipline of Eicher, 2003 SD 40, ¶ 25, 661 NW2d 354, 363.

[¶52.]     When Reynolds signed the initial Private 60 Agreement he admitted that he: a) failed to respond to J.W.'s repeated requests regarding the status of his file; b) neglected J.W.'s file; c) allowed the statute of limitations to expire without informing J.W.; and, d) failed to seek permission from J.W. and the City of Rapid City, clients with an apparent conflict of interest. Reynolds admitted that his conduct violated the Rules of Professional Conduct:

- Rule 1.3: Diligence
- Rule 1.4: Communication
- Rule 1.5: Fees
- Rule 1.7: Conflict of Interest: Current Clients
- Rule 8.4(a): Misconduct by violating the Rules of Professional Conduct
- Rule 8.4(c): Misconduct by engaging in conduct involving dishonesty, fraud, deceit or misrepresentation.

[¶53.]     The Private 60 Agreement allowed Reynolds to continue practicing law under conditions designed to ensure that the conduct that brought him before the Disciplinary Board would not be repeated. Unfortunately, this was not the case. The first red flag was Reynolds' failure to sign the initial Private 60 Agreement in a timely manner.

[¶54.]     The Amended Private 60 Agreement limited Reynolds' practice, added a mentoring program, and required the self-reporting of client claims of lack of communication and diligence. Despite this, Reynolds failed to respond to E.W.'s repeated requests for his file and the status of his case, claiming, in part, that he did not receive E.W.'s messages. He did not self-report. Reynolds ignored his

mentor's directives regarding E.W.'s case, again claiming that he did not receive Mentor's letter. Reynolds only produced E.W.'s file when subpoenaed to do so.

[¶55.] The Disciplinary Board continued to work with Reynolds to "salvage" his career by entering into a Second Amended Private 60 Agreement in March 2007 that limited Reynolds' practice of law to Dunbar Enterprises, LLC. Reynolds, however, ignored the agreement and appeared in federal court on behalf of the Sturgis Area Chamber of Commerce. He did not respond to repeated Disciplinary Board letters requesting an explanation. He failed to appear at the Disciplinary Board's due process hearing, again repeating the refrain that he did not receive the notice.

[¶56.] Reynolds' conduct in the Tatanka lawsuit mirrored his conduct in J.W.'s and E.W.'s cases and his conduct before the Disciplinary Board. According to the memorandum decision filed by Judge Johnson, Reynolds did not respond to notices and did not inform his clients of the status of the case. Reynolds' defense was that he received none of the notices that were sent.

[¶57.] Reynolds' pattern of non-response continued after the Disciplinary Board filed its formal accusation and petition for temporary suspension. Reynolds failed to respond to either within the statutory time frame.

[¶58.] Reynolds' pattern of neglecting his clients' cases resulted in serious consequences to his clients' legal positions. Reynolds ignored the fundamental principle that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Rule 1.3, South Dakota Rules of Professional Conduct, SDCL

16-18 Appx. The Comment to Rule 1.3 succinctly analyzes Reynolds' repeated

conduct:

> Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.

[¶59.] In addition to neglecting his clients' legal matters, Reynolds

demonstrated a pattern of failing to communicate with clients regarding the status

of their cases and files. Rule 1.4 of the South Dakota Rules of Professional

Responsibility provides, in part,

> (a) A lawyer shall:
>
> > (3) keep the client informed about the status of the matter;
> >
> > (4) promptly comply with reasonable requests for information[.]

The Comment to Rule 1.4 explains:

> A lawyer's regular communication with clients will minimize the occasions on which a client will need to request information concerning the representation. When a client makes a reasonable request for information, however, paragraph (a)(4) requires prompt compliance with the request, or if a prompt response is not feasible, that the lawyer, or a member of the lawyer's staff, acknowledge receipt of the request and advise the client when a response may be expected. Client telephone calls should be promptly returned or acknowledged.

Reynolds could have avoided much of this disciplinary proceeding by heeding this advice.

[¶60.]    The pattern of Reynolds' neglect of his clients' legal matters and failure to communicate with clients extended further.  Reynolds repeatedly failed to respond to Disciplinary Board demands for explanation, response, subpoena, and hearing, and violated the Private 60 Agreement that the Disciplinary Board and he agreed to.  He ignored his mentor's directives.  These failures constitute a violation of SDCL 16-19-54, and are a separate basis for discipline.  Discipline of Tidball, 503 NW2d 850 (SD 1993).  We have long admonished:

> The members of the [Disciplinary Board] perform a difficult and all too often thankless task in investigating charges of professional misconduct against their brother lawyers.  In this instance the members of the [Board] gave respondent several opportunities to appear before the [Board] and offer his explanation regarding the charges that had been made against him, opportunities that he spurned.  We consider respondent's failure to respond to the communications from the [Disciplinary Board] to be indicative of his attitude towards the serious nature of the complaints lodged by (his clients).  Lest anyone consider that the consequences of failing to reply to the [Disciplinary Board] are singularly visited upon the respondent, let this opinion be fair notice that similar inexcusable failures to respond will count heavily in any subsequent formal disciplinary proceedings brought against an attorney.  He acts at his peril who treats a communication from the [Disciplinary Board] with the indifference accorded an unsolicited invitation to join a book club.  (citations omitted).

In re Rude, 88 SD 416, 422-423, 221 NW2d 43, 47.

[¶61.]    Reynolds defends much of his inaction to his failure to receive phone calls, letters, e-mails, and notices.  Circuit Judge Johnson found this explanation "void of credibility" and "false."  We find it disingenuous, at best.  Reynolds claims of

nonreceipt were not isolated. Rather, Reynolds claims were a part of his pattern of conduct to his clients, the Disciplinary Board, his mentor, and ultimately this Court.

[¶62.]    The Disciplinary Board is not conducting a baby-sitting service for wayward attorneys who have lost their way. It is charged with the protection of the public. It was Reynolds' obligation and in his self-interest to promptly comply with all Board notices and directives. He consistently failed to do so. Once again we are presented with a "blaming others' mentality" which in this case includes, Reynolds' clients, the Disciplinary Board, the U.S. Postal Service and his attorney mentor, excuses which we have in the past consistently rejected and continue to do so today. *In re* Discipline of Laprath, 2003 SD 114, ¶ 84, 670 NW2d 41, 66-67; *Eicher*, 2003 SD 40 ¶ 52, 661 NW2d at 370; Matter of Dorothy, 2000 SD 23, ¶¶ 42-47, 605 NW2d 493, 505-507; Application of Widdison, 539 NW2d 671, 678 n15 (SD 1995).

[¶63.]    We are not unmindful that Reynolds at one time enjoyed a good reputation within the bar, provided service to the bar, and served his community and church. "While this may be relevant in the determination of proper level of discipline, it can hardly rise to the level of exoneration." *In re Discipline of Mattson*, 2002 SD 112 at ¶ 54, 651 NW2d at 289. At some point in time, however, "inexplicable" to the Board counsel Frieberg, Reynolds "became unable, or simply refused, to properly execute his professional responsibilities in conjunction with the acceptance and resolution of various cases." *Matter of Discipline of Wehde*, 517 NW2d at 133. Our observation in Matter of Discipline of Kintz, 315 NW2d 328, 331 (SD 1982) rings true of Reynolds:

> For whatever reason that remains hidden in his psyche,
> respondent could not bring himself to perform his
> professional obligations to his clients in a timely manner.
> Nonetheless, the clients suffered as much as though
> respondent had acted out of evil motive. Accordingly, we
> must take such action as is necessary to protect the public
> from future neglect by respondent.

[¶64.]    Our "paramount" constitutional duty remains the protection of the

public. In *Tidball* we set forth very clearly what guides this Court:

> Nevertheless the standard which governs our deliberations is
> clear. We are not to balance the potential for rehabilitation
> against protection of the public. Our duty to protect the public
> is paramount and encouragement for rehabilitation must be
> done within that context. [*In re*]*Rude*, *supra,* 221 NW2d [43] at
> 48. . . . The client suffers as much through the misconduct [of
> procrastination] as if the same misconduct had as it source a
> calculated evil motive. *Matter of Kintz,* [315 NW2d 328 SD
> 1982] *supra.* To hold otherwise would wreak havoc with the
> process of disciplinary proceedings for all too frequently
> misconduct by attorneys appears to be attributable at least in
> part to the factor [of procrastination]. *Walker,*[254 NW2d 452
> (SD 1977)] *supra* at 455.

503 NW2d at 856.

## APPROPRIATE DISCIPLINE

[¶65.]    Our disciplinary options are disbarment, suspension for up to three

years, placement on probationary status, and public censure. SDCL 16-19-35.

Based on this record we cannot, pursuant to our duty under SDCL 16-19-31, certify

as Justices of this Court that Reynolds is "fit to be entrusted with professional and

judicial matters, and to aid in the administration of justice as an attorney and as an

officer of the court." It is the order of this Court that Reynolds be suspended from

the practice of law for three years, effective immediately. *See Tidball, supra.* While

disbarment could be justified in this case for protection of the public, a lengthy

#24932

suspension will allow a once very competent attorney time to identify to himself his professional flaws and attempt to cure them. *Eicher,* 2003 SD 40 at ¶ 54, 661 NW2d at 371. The burden to do so remains upon Reynolds.

[¶66.]    We believe the conditions imposed in *Disciplinary of Wehde*, 517 NW2d at 134 are appropriate in Reynolds' case:

> Before [Reynolds] may apply for readmission to the Bar he must take, and pass, the Multistate Professional Responsibility Examination, successfully complete a law office management course, have a complete psychological evaluation and submit the results to the Board, and reimburse the Unified Judicial System and the State Bar of South Dakota for all reasonable costs and expenses generated as a result of this proceeding. Additionally, upon application for readmission to the Bar, [Reynolds] must successfully demonstrate, to the satisfaction of the Board, that he is able and willing to execute his professional responsibilities with the highest punctilio. Upon readmission, [Reynolds] must agree to file monthly reports with the Board on the status of all open files for a period of two years. Failure to meet the suspension conditions will result in permanent disbarment.

The Disciplinary Board is not precluded from examining allegations which have not been previously and fully litigated by the Board.

[¶67.]    It is so ordered.

[¶68.]    ZINTER and MEIERHENRY, Justices, and WILBUR, Circuit Judge and MILLER, Retired Justice, concur.

[¶69.]    WILBUR, Circuit Judge, sitting for KONENKAMP, Justice, disqualified, and MILLER, Retired Justice, sitting for SABERS, Retired Justice, disqualified.