#25490-GAS

**2011 S.D. 17**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE

DISCIPLINE OF LANCE RUSSELL,

AS AN ATTORNEY AT LAW.

* * * *

ORIGINAL PROCEEDING

* * * *

ROBERT B. FRIEBERG
Disciplinary Board Counsel
Beresford, South Dakota                      Attorney for Disciplinary
                                             Board.

MICHAEL K. SABERS of
Clayborne, Loos, Strommen
  & Sabers, LLP
Rapid City, South Dakota                     Attorney for Lance Russell.

* * * *

ARGUED JANUARY 10, 2011

OPINION FILED **04/20/11**

#25490

SEVERSON, Justice

[¶1.] This is a disciplinary proceeding against Lance Russell, a member of the State Bar of South Dakota. The Disciplinary Board of the State Bar recommended that Russell be publicly censured. The Referee, Retired Justice Robert A. Miller, also recommended a public censure. In his brief in response to the Referee's findings of fact, conclusions of law, and recommendation, Russell asks this Court to dismiss the Board's and the Referee's recommendation. At oral argument, however, Russell's counsel told the Court that a "private censure" with conditions imposed to ensure that the conduct resulting in these proceedings does not reoccur would be appropriate.[1]

## GENERAL BACKGROUND

[¶2.] Russell graduated from the University of South Dakota School of Law in 1999. He passed the South Dakota bar examination and was admitted to practice law on January 10, 2000.

---

1. A "private censure" is not a recognized form of discipline by the Supreme Court. A "private reprimand" is an authorized form of discipline for the Disciplinary Board. SDCL 16-19-35. Further, "[i]f it is determined after an investigation by the board that the complaint is meritorious, but that formal disciplinary proceedings are not warranted, the board and the attorney may agree in writing to hold the proceedings in abeyance for a definite period, provided the attorney throughout the period complies with specified reasonable conditions." SDCL 16-19-60. This provision is inapplicable at the current stage of the disciplinary process. *Id.* The Supreme Court, however, can impose conditions if it determines that placement on probationary status is the appropriate discipline. SDCL 16-19-35(3).

-1-

[¶3.] After graduating from law school, Russell clerked for the circuit court in Deadwood, South Dakota for a year. He then entered the private practice of law in Hot Springs, South Dakota. In 2000 he was elected State's Attorney for Fall River County. Russell was reelected in 2004. In 2008 Russell chose not to seek a third term. Instead, he ran for and was elected to the South Dakota Legislature, representing District 30 in the House of Representatives. Russell was reelected to this position in 2010.

[¶4.] During the pendency of this disciplinary proceeding, the only one ever filed against him, Russell completed a LL.M. program in environmental law at the University of Denver. While Russell told the Disciplinary Board that he would like to practice in some capacity in the areas of environmental law and natural resources law, he told this Court that his plans are uncertain until this disciplinary matter is resolved.

[¶5.] The focus of this disciplinary proceeding was two-fold. First it examined Russell's use of the grand jury to investigate a controversial golf course expansion project in Hot Springs and Russell's release of the grand jury transcript to the public. Second, it examined Russell's issuance of a press release criticizing and blaming Judge Jeff Davis for the trial delay in the homicide case of *State v. Fast Horse.*

## GRAND JURY

[¶6.] In 2002 the Common Council of Hot Springs entered an agreement with Steve and Carla Simunek for the construction of an additional nine holes to

the Hot Springs golf course.[2] The project was fraught with controversy and divided the community and Common Council.

[¶7.]       In November 2006, Russell was approached by a number of people including Steven Schjodt, a civil engineer for the Army Corps of Engineers and a contributor to Russell's campaigns, and asked to draft a petition to recall Hot Springs Mayor Carl Oberlitner for misconduct, malfeasance, corruption, oppression, and gross partiality in the sale of the Carnegie Library and the development of the new nine holes to the municipal golf course. Russell asked for Schjodt's input in drafting the petition and Schjodt suggested revisions.

[¶8.]       By 2007 the South Dakota Department of Legislative Audit had completed an investigation of the golf course project at the direction of the Attorney General's office. No criminal action resulted. The Department of Revenue was in the midst of auditing the records of the project's general contractor, and the city of Hot Springs was in litigation with the general contractor concerning the cost of the project and sufficiency of the work performed.

[¶9.]       Russell was aware of the investigation, audit, and civil litigation when a city councilman, Don Patitz, and Schjodt met with Russell and expressed their dissatisfaction with Mayor Oberlitner's handling of the golf course issue and what they believed were billing irregularities by the Simuneks. Patitz and Schjodt were not satisfied with the other investigations and were adamant that Mayor Oberlitner and the Simuneks needed to be punished.

---

2.    *See Okerson v. Common Council of Hot Springs,* 2009 S.D. 30, 767 N.W.2d 531.

[¶10.] Due in large measure to Patitz's and Schjodt's urging, Russell applied for and received an order calling a grand jury to convene on July 27, 2007, primarily to investigate the golf course project. At that time, Russell was in his second term as State's Attorney and seventh year as a prosecutor.

[¶11.] During the course of the grand jury proceedings Schjodt testified twice. Because of Schjodt's background in dealing with federal construction projects and his knowledge of construction costs and taxes, Russell considered Schjodt to be "my expert essentially."[3]

[¶12.] Throughout the grand jury proceedings Russell regularly consulted with Schjodt. Schjodt provided Russell with his personal and professional opinions regarding the scope and quality of the contractor's work on the golf course. Schjodt also provided Russell with suggestions as to witnesses, and grand jury strategy. Further, Schjodt encouraged Russell to continue the investigation as a means to enhance Russell's reputation. The Referee found that the extensive communication between Schjodt and Russell demonstrated "that Schjodt arguably influenced the direction of the grand jury proceedings." Russell admitted that he gave Schjodt information from the grand jury proceedings. Schjodt shared some of this information, by unsigned letter, with a citizen who did not agree with his viewpoint.

[¶13.] While the grand jury was impaneled and continuing its investigation of the golf course project, Judge Davis, the presiding judge in the Seventh Circuit, began to hear rumors "that what was taking place in the Grand Jury was known on

---

3. Russell also consulted with two independent golf course experts.

the street." Because of his concern for the integrity of the grand jury process and

the secrecy of it, Judge Davis drove to Hot Springs in April 2008 to meet with

Russell. Judge Davis told Russell:

> You've abused your authority as a State's Attorney. There are
> things on the street that should not be there out of the Grand
> Jury process. I don't know what all you've got going. You've got
> 30 days to wrap it up because I am pulling your Grand Jury on
> you.

[¶14.] On May 20, 2008, the grand jury indicted the golf course contractor,

Steven Simunek, and his wife, Carla, as co-defendants. The Simuneks were

charged with seven Class 6 felonies,[4] two Class 5 felonies,[5] and seven Class 1

misdemeanors.[6] Mayor Oberlitner was charged with one Class 2 misdemeanor.[7]

[¶15.] The defendants retained experienced counsel who began discovery and

discussed the cases with Russell. Schjodt continued to advise and consult with

Russell and Russell intended to use Schjodt as an expert at trial. Inexplicably,

Russell did not consider Schjodt's written documents or his involvement in the

---

4. Making a false or fraudulent contractors' excise tax return in attempting to defeat or evade contractors' excise tax. SDCL 10-46A-8, SDCL 10-46A-13.1(1).

5. Attempted grand theft of public funds by false instrument, SDCL 4-9-5; SDCL 22-30A-17, or, in the alternative, attempted grand theft. SDCL 22-30A-1, SDCL 22-30A-17(1).

6. Failing to file returns or pay tax, SDCL 10-46A-13, SDCL 10-46A-13.1(2); tax evasion by false or fraudulent return. SDCL 10-46-37.

7. Neglect of duty or misconduct by municipal officer. SDCL 9-14-37.

proceedings to be exculpatory as impeachment evidence affecting witness credibility and did not disclose these matters to the defense.[8]

[¶16.]    After consulting Schjodt, on August 18, 2008, Russell offered to settle the charges against Steven Simunek (Simunek) on the following terms:

A. That Simunek plead guilty to any four counts of his choosing;

B. The remainder of the charges would be dismissed;

C. Upon Simunek's plea, the State would dismiss all charges against his spouse;

D. The State would not resist a request for a suspended imposition of sentence;

E. *The entire grand jury proceedings leading to the indictment of Mr. and Mrs. Simunek including the transcripts and exhibits will be unsealed and filed in the criminal case;*

F. The defendants would to the satisfaction of the Department of Revenue, file or refile sales, use and excise tax returns; and,

G. The State and defendant reserve the right to aggravate/mitigate at the time of sentencing.

(Emphasis added.)

[¶17.]    Russell also offered to settle the charges against Mayor Oberlitner on the following terms:

A. That the defendant waive any and all rights to a speedy trial;

B. That the defendant obey all laws, etc.;

C. That the defendant write a letter of apology to the citizens of Hot Springs which must be approved by [Russell] prior to the

---

8.    *See Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

offer becoming binding with a publication date in the Hot Springs Star after November 4, 2008;

D. *That the defendant agree that the entire grand jury proceedings leading to the indictment of defendants Steven and Carla Simunek, including the transcripts and exhibits, will be unsealed, filed and become a public record;* and

E. That if the defendant fulfills all of the terms the State will on December 31, 2008 dismiss with prejudice the charge of Neglect of Duty or Misconduct by a Municipal Officer.

(Emphasis added.)

[¶18.]    Russell had never before put a condition in a plea agreement calling for the public release of grand jury transcripts. He admits that he did not research the law concerning the restrictions on disclosure of grand jury proceedings. SDCL 23A-5-16 governs restrictions on disclosure of grand jury proceedings. Russell believed that releasing the grand jury transcripts would inform the public of the facts of the golf course project and dispel problems within the community of Hot Springs. Simuneks and Mayor Oberlitner did not testify before the grand jury.

[¶19.]    Simunek accepted and pleaded guilty to four misdemeanors. His attorney testified he did not contest the provisions on release of the grand jury proceedings as the terms of the plea agreement were favorable to his client and he had no authority to release the proceedings in any event. Judge Tice sentenced Simunek to six months in jail with all but three days suspended and imposed a fine and costs. All of the charges against Simunek's wife were dismissed. Mayor Oberlitner also accepted Russell's offer and wrote a letter of apology that was published in the Hot Springs Star.

[¶20.]     Litigating parties cannot agree to modify state law. But presumably relying on the plea agreement, on November 18, 2008, Judge Tice signed an "order for opening grand jury proceedings" that Russell prepared. This order said:

> The Court, after being fully advised in the premises, hereby
> ORDERS that the Grand Jury transcript and exhibits leading to the Indictments of Carl Oberlitner and Steve Simunek shall be considered public records open for public inspection exclusively through the Fall River County State's Attorney's Office; however, any information deemed by the Fall River County State's Attorney to be unrelated to the Indictments will not be considered public records and may not be disclosed to the public.

Russell did not notify any of the defendants or their counsel that he secured this order. Russell also did not advise them when he made the transcripts available to the public and provided copies to the Rapid City Journal and Hot Springs Star newspapers. The order improperly opened grand jury proceedings beyond any legitimate needs of a prosecutor contrary to SDCL 23A-5-16 and also improperly delegated authority to the State's Attorney.

[¶21.]     Prior to the end of Russell's term as State's Attorney, Schjodt directed Russell to get rid of Schjodt's notes and emails to Russell because Schjodt did not want Russell's successor "going through that stuff and causing me trouble." Russell did shred records of the Fall River State's Attorney's office including documents relating to the golf course project. He testified that he received guidance from the Attorney General's office.

[¶22.]     In January 2009, Russell was no longer Fall River County's State's Attorney. He was a member of the South Dakota House of Representatives.

According to Russell several newspaper articles had accused him of abusing his power as State's Attorney. He believed that people were intent on destroying him politically and personally. Russell testified:

> And I tried to defend myself. And the way in which I figured I could defend myself, the only way, is with the facts. I had an order from a judge that I believed was valid and I put [the grand jury transcript] on my website [www.representativerussell.com]. Should I have in retrospect? No I should not have. It was unnecessary. I had gained a conviction. But I was getting beat up so badly that I felt I had to do something.

[¶23.] On February 19, 2009, Judge Davis, the presiding judge who impaneled the grand jury, signed and filed an "order to seal transcript" which provided:

> This matter having come before the Court upon information provided to the Court as to the release of the grand jury proceedings from Fall River Grand Jury #07-02; the release of the grand jury transcript and exhibits is not related to any prosecutorial duties as is required by SDCL 23A-5-16; the release of the grand jury transcript and exhibits is not related to any valid judicial proceeding as is required by SDCL 23A-5-16; no grounds exist for the release of the grand jury transcript; the prior order of the Court was improperly submitted to the Court upon improper grounds; the Court having reviewed SDCL 23A-5-16 and the Court finding that the release of the grand jury transcript and exhibits as to Fall River Grand Jury #07-02 are in violation of said law; the Court being fully informed as to the law, facts and circumstances related to the matters relevant herein; it is hereby
>
> ORDERED, that the Fall River County Clerk of Courts shall immediately seal any and all grand jury transcripts and exhibits which were produced or are related to any and all matters considered by Fall River County Grand Jury #07-02; and it is further
>
> ORDERED, that the Fall River County State's Attorney's Office shall not release any grand jury transcripts and exhibits which were produced or are related to any and all matters

considered by Fall River County Grand Jury #07-02, unless by further order of this Court[.]

[¶24.] The Fall River State's Attorney who succeeded Russell was able to retrieve most, but not all, of the grand jury transcripts released by the State's Attorney's office. Certain media refused to return the copies. Russell removed the transcript from his website.

FAST HORSE

[¶25.] A high profile homicide case *State v. Fast Horse* had been pending since 2006. Russell was the prosecutor and Tim Rensch the defense attorney with Judge Davis presiding.

[¶26.] The case had been pending for some time due to: a) an intermediate appeal to the Supreme Court of an order Judge Davis entered; b) incomplete discovery; c) incomplete jury questionnaires; and, d) the need to locate a trial site outside of the small Fall River County courtroom due to the need to call a large number of prospective jurors.

[¶27.] Russell sought a trial date to get the Fast Horse case tried before the end of his term. However, Judge Davis and defense counsel Rensch were not prepared to try the case in December 2008 because of Russell's lag in completing required disclosures to the defense and the lack of a suitable site for the trial until the beginning of 2009.

[¶28.] In early December 2008, Russell issued a press release which criticized Judge Davis and, according to an article posted on the Rapid City Journal's website, "implied that [Judge Davis] dragged [his] feet in setting a trial date for accused murderer Shannon Fast Horse."

REFEREE

[¶29.]    In ultimately recommending the public censure of Russell, the Referee

concluded:

A.  [Russell] exercised poor judgment and violated the Rules of
    Professional Conduct Rule 3.8 concerning special
    responsibilities of prosecutors; Rule 4.4(a) concerning respect
    for rights of third persons; Rule 8.2(a) concerning judicial
    officials; and Rule 8.4(a)(d) concerning professional
    misconduct.  He used his office as State's Attorney: (a) to
    further local political aims of his associate and advisor,
    Schjodt and others who shared opposition to the golf course
    project; (b) to enhance and/or defend his own political career;
    and (c) by failing to use his independent professional
    judgment in the conduct of the investigation of the golf
    course project.

B.  [Russell's] misconduct (1) in publicizing and putting the
    grand jury transcript on his web site and (2) in preparing and
    in issuing the press release criticizing Judge Davis for the
    delay in the trial of the Fast Horse case, standing alone,
    warrant the discipline that this Referee is recommending.

C.  [Russell's] misconduct is mitigated by the absence of a prior
    disciplinary record, a cooperative attitude toward the Board
    in its proceedings, his relative inexperience in the practice of
    law, and his willingness to concede that his conduct was
    improper and that he made mistakes.  [Russell] who intends
    to complete a masters program and principally practice law
    in the areas of environment and natural resources has
    indicated that he has no present intention of again seeking a
    position as a public prosecutor.

STANDARD OF REVIEW

[¶30.]    "Our decisions in disciplinary cases are based upon the record made at

the hearing before the referee, not upon the basis of the report and recommendation

of the [Disciplinary Board] or the Attorney General." *In re Kunkle,* 88 S.D. 269, 283,

218 N.W.2d 521, 529 (1974).

[¶31.] The findings of the Referee are given careful consideration by this Court because the Referee had the advantage of encountering the witnesses first hand. *In re Discipline of Laprath*, 2003 S.D. 114, ¶ 41, 670 N.W.2d 41, 55. This Court has said that:

> [W]hile the findings of the referee are not conclusive, we must consider them carefully because the referee had the advantage of seeing and hearing the witnesses. If the referee's findings are supported by the evidence, they will not be disturbed by the Supreme Court.

*Matter of Discipline of Dana*, 415 N.W.2d 818, 822 (S.D. 1987) (quoting *In re Rensch*, 333 N.W.2d 713, 714 (S.D. 1983)).

> On the other hand, we give no particular deference to a referee's recommended sanction. The ultimate decision for discipline of members of the State Bar rests with this [C]ourt. *In re Hopp*, 376 N.W.2d 816 (S.D. 1985); [*In re Willis,* 371 N.W.2d 794 (S.D. 1985)]; SDCL 16-19-22. Therefore, although we may adopt the findings of a referee, it does not necessarily follow that we will also adopt his recommendations. *Rensch,* [333 N.W.2d at 714]; [*In re Strange*, 366 N.W.2d 495 (S.D. 1985)].

*Id.*

## DUE PROCESS

[¶32.] "[D]isciplinary proceedings have been termed quasi-criminal in nature." *Kunkle*, 88 S.D. at 280, 218 N.W.2d at 527 (citing *In Re Ruffalo*, 390 U.S. 544, [551,] 88 S. Ct. 1222, [1226,] 20 L. Ed. 2d 117 (1968)). This Court's authority to conduct the proceedings, however, stems from the constitution, S.D. Const. art. V, § 12, statute, SDCL 16-16, and the inherent power of the Court to regulate the practice of law. *Id.* This inherent power "must of course be exercised in a manner that comports with due process." *Id.*

[¶33.] Russell contends that he was not afforded due process before the Disciplinary Board. He contends that issues that had not been noticed were central to the case, he did not receive specification of rule subsections that he allegedly violated, and the Disciplinary Board Chair was biased.

[¶34.] Russell contends he had no notice of questions by the Disciplinary Board concerning Russell's alleged domestic violence and the delay in bringing the Fast Horse case to trial. It was Russell, however, who brought these issues to the Disciplinary Board's attention. In his response to the complaint, Russell attached exhibits which included a photocopy of a letter from a group of citizens to Governor M. Michael Rounds inquiring about the allegations and investigation of alleged domestic violence as well as photocopies of newspaper articles detailing the allegations of domestic violence and the delay in bringing Fast Horse to trial. Russell's submission to the Disciplinary Board opened the door to questioning him about the issues. The Disciplinary Board has the power and duty to investigate any alleged ground for discipline "called to its attention." SDCL 16-19-29(1).

[¶35.] Russell also contends that he did not receive specific enough notice of the rules and their subsections that he allegedly violated. Regardless of whether disciplinary proceedings are considered civil or quasi-criminal in nature, the complaint must "adequately inform" the respondent of the nature of the charge against him. *Kunkle*, 88 S.D. at 274, 218 N.W.2d at 524.

> Even in criminal cases the charge is sufficient if it enables a person of common understanding to know what is intended from the language contained therein and if it apprises a defendant with reasonable certainty of the accusation against him so that he may prepare his defense.

*Id.*, 88 S.D. at 274-75, 218 N.W.2d at 524.

[¶36.]     Russell received fair notice of what he was facing and was not misled or prevented from preparing an adequate defense. "[I]t is incumbent on an attorney to know the disciplinary rules regulating his profession." Samuel T. Reaves, Procedural Due Process Violations in Bar Disciplinary Proceedings, 22 J. Legal Prof. 351, 354 (1998) (quoting *State v. Turner* 538 P.2d 966, 972 (Kan. 1975)).

[¶37.]     Finally, Russell contends that he was denied due process because the Board Chair was assigned to the complaint, directed the investigation, and participated in the hearing and decision making process. *See* Rules of Procedure of the Disciplinary Board of the State Bar of South Dakota. SDCL app. 16-19.

[¶38.]     Members of the Disciplinary Board "shall refrain from taking part in any proceeding in which a judge, similarly situated, would be required to abstain." SDCL 16-19-28. There is no suggestion that the Board's Chair had prior independent knowledge of Russell's case and no suggestion that her impartiality might be questioned. Canon 3(E), Code of Judicial Conduct. SDCL app. 16-2. Russell requested that Disciplinary Board member Roger Tellinghuisen recuse himself which he did. Russell made no such request of the Board Chair.

[¶39.]     In *Kunkle,* the constitutionality of SDCL ch. 16-19 (the disciplinary process) was challenged as violative of due process because the procedure placed "the court in the untenable position of being the investigator, the grand jury or indictor, the prosecutor and the final arbiter and judge in disciplinary actions." 88 S.D. at 279, 218 N.W.2d at 526. This Court noted:

> We think the procedure condemned in the Murchison case is a
> far cry from our statutory procedures for conducting disciplinary

actions. Granted that disciplinary proceedings have been termed quasi-criminal in nature, . . . they are sui generis in the sense that this court's authority to conduct them stems from the inherent power of the court to regulate the practice of law. Although this inherent power must of course be exercised in a manner that comports with due process, we must recognize the fact that the courts occupy a traditionally unique position vis-à-vis the members of the legal profession. This court has the responsibility of protecting the public from the unfit, the incompetent and the dishonest attorney, and the duty to maintain the high ethical standard of the legal profession. This court has no interest other than to accomplish that purpose. We have no financial interest in the outcome of any disciplinary action. This court has no interest in any given disciplinary action other than to see that all legitimate complaints are adequately investigated and that proper proceedings are brought if in the court's opinion the results of the investigation are such as to warrant the filing of a formal complaint. We consider our authority to review and weigh the results of a preliminary investigation to be as much a shield of protection for the attorney who may be accused by those having improper, vindictive motives as it is an aid to the court to carry out its solemn obligation to protect the public from those few members of the bar who by their conduct have demonstrated that they are not fit to be members of the profession. In short, we consider the authorities cited by respondent to be inapposite and we hold that the procedure set forth in SDCL 16-19 does not unconstitutionally deprive an accused attorney of his right to due process of law.

*Id.*, 88 S.D. at 280-81, 218 N.W.2d at 527-28 (internal citations omitted).

## THE ROLE OF THE PROSECUTOR

[¶40.] The United States Supreme Court has explained that a prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314, 1321 (1935).

[¶41.] The Minnesota Supreme Court in addressing the role of a prosecutor

has stated:

> We have repeatedly stated that a "prosecutor is a minister of justice whose obligation is to guard the rights of the accused as well as to enforce the rights of the public." *E.g., State v. Cabrera,* 700 N.W.2d 469, 475 (Minn. 2005); *State v. Salitros,* 499 N.W.2d 815, 817 (Minn. 1993) (quoting I *ABA Standards for Criminal Justice,* The Prosecution Function 3-1.1 and Commentary at 3.7 (2d ed. 1979)) (internal quotations omitted). The duty of a prosecutor is to see that justice is done on behalf of both the victim and defendant. *Berger v. United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). Therefore, a prosecutor does not "represent" the victim. *See id.* A prosecutor represents the public interest and the sovereign and his goal is to see that justice is done. *Id.* This places a special burden on prosecutors because they should prosecute with "earnestness and vigor," but must "refrain from improper methods calculated to produce a wrongful conviction." *Id.*

*State v. Penkaty,* 708 N.W.2d 185, 196-197 (Minn. 2006).

[¶42.] "A prosecutor has the responsibility of a minister of justice and not

simply that of an advocate." Comment, Rule 3.8, South Dakota Rules of

Professional Conduct. SDCL app. 16-18. Rule 3.8 of the Rules of Professional

Conduct recognizes the special responsibilities of a prosecutor:[9]

---

9. In *State v. Brandenburg,* 344 N.W.2d 702, 706 (S.D. 1984), this Court recognized the role and responsibilities of a prosecutor under the prior Code of Professional Responsibility:

> Ethical Consideration 7-13 of the Code of Professional Responsibility set forth in SDCL 16-18, Appx., provides:
>
> The responsibility of a public prosecutor differs from that of the usual advocate; *his duty is to seek justice,* not merely to convict. This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is

(continued . . .)

The prosecutor in a criminal case shall:
  (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause;
  (b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining counsel and has been given reasonable opportunity to obtain counsel;
  (c) not seek to obtain from an unrepresented accused a waiver of important pretrial rights, such as the right to a preliminary hearing;
  (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to exculpate the guilt of the accused, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged exculpatory information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal;
  (e) not subpoena a lawyer in a grand jury or other criminal proceeding to present evidence relating to the lawyer's representation of a past or present client unless the prosecutor reasonably believes:
     (1) the information sought is not protected from disclosure by any applicable privilege;
     (2) the evidence sought is essential to the successful completion of an ongoing investigation or prosecution; and
     (3) there is no other feasible alternative to obtain the information;
  (f) except for statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose,

_____

(. . . continued)

not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and, (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts.  With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. *Further,* a *prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.*

> refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise a reasonable care to prevent investigators, law enforcement personnel, employees of other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.6 or this Rule.

[¶43.]    In this case it is clear that Russell had a fundamental misunderstanding of his role as a prosecutor, who he represented as a prosecutor, and the independent judgment that a prosecutor must exercise. Russell allowed his personal and political views of the golf course project and the mayor's handling of the issue to cloud his independent judgment as a prosecutor. Russell allowed Schjodt, a political supporter who shared Russell's views, to influence the decision to convene the grand jury. Through the course of the grand jury proceeding, Russell relied on Schjodt for advice on witnesses, evidence, and strategy and shared information from the grand jury proceedings with him. As the Referee found, "Schjodt arguably influenced the direction of the grand jury" and Russell admitted he allowed Schjodt to cross professional lines that he should not have. Russell's reliance on Schjodt continued after the grand jury dissolved. Russell considered him an expert witness, but failed to disclose his involvement in the case to the defense. Russell even consulted Schjodt on the terms of the plea agreements.

[¶44.]    The United States Supreme Court recently stated:

> Prosecutors have a special "duty to seek justice, not merely to convict." LSBA, Articles of Incorporation, Art. 16, EC 7–13 (1971); ABA Standards for Criminal Justice 3–1.1(c) (2d ed. 1980). Among prosecutors' unique ethical obligations is the duty to produce *Brady* evidence to the defense. *See e.g.*, LSBA, Articles of Incorporation, Art. 16, EC 7–13 (1971); ABA Model Rule of Prof. Conduct 3.8(d) (1984). An attorney who violates

> his or her ethical obligations is subject to professional discipline, including sanctions, suspension, and disbarment. *See e.g.,* LSBA, Articles of Incorporation, Art. 15, §§ 5, 6 (1971); *id.,* Art. 16, DR 1–102; ABA Model Rule of Prof. Conduct 8.4 (1984)

*Connick v. Thompson,* __ U.S. __, __, 131 S. Ct. 1350, 1362-63, __ L. Ed. 2d __ (2011). "Prosecutors are not only equipped but are also ethically bound to know what *Brady* entails and to perform legal research when they are uncertain." *Id.* at 1363.

[¶45.]      In making the release of the grand jury transcript a part of the plea agreements and in preparing an order for Judge Tice's signature allowing its release, Russell admits that he did not research the law. SDCL 23A-5-16 clearly prohibited its release, and Russell misled the trial court by submitting an order to an inattentive judge upon improper grounds. Russell's release of the transcript was an effort to protect his personal reputation from increasing public criticism.

[¶46.]      Growing public criticism of Russell also spurred his decision to issue a press release critical of Judge Davis and blaming Judge Davis for the delay in the Fast Horse case. "A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge[.]" South Dakota Rules of Professional Conduct, Rule 8.2.

## APPROPRIATE DISCIPLINE

[¶47.]      In determining appropriate discipline this Court considers the seriousness of the misconduct by the attorney, the likelihood of repeated instances of similar misconduct, and the prior record of the attorney. *Laprath,* 2003 S.D. 114, ¶ 77, 670 N.W.2d at 64. In addition, "[i]n determining an appropriate discipline,

this Court reviews the totality of the attorney/client relationship to determine if any mitigating factors warrant consideration." *In re Discipline of Dorothy,* 2000 S.D. 23, ¶ 39, 605 N.W.2d 493, 504. "We take the action necessary to protect the public from future harm at the hands of an attorney whose conduct is under question." *In re Discipline of Light,* 2000 S.D. 100, ¶ 12, 615 N.W.2d 164, 168.

[¶48.]    Misconduct constitutes grounds for attorney discipline. SDCL 16-19-33. According to SDCL 16-19-35:

> Misconduct shall be grounds for:
> (1) Disbarment *by the Supreme Court*;
> (2) Suspension *by the Supreme Court* for an appropriate fixed period of time, or for an appropriate fixed period of time and an indefinite period concurrently or thereafter to be determined by the condition imposed by the judgment. No suspension shall be ordered for a specific period in excess of three years;
> (3) Placement on a probationary status *by the Supreme Court* for a stated period, or until further order of the court, with such conditions as the court may specify;
> (4) Public censure *by the Supreme Court*; or
> (5) Private reprimand *by the Disciplinary Board.*

(Emphasis added.)

[¶49.]    Although this Court has not adopted the ABA Standards for Imposing Lawyer Sanctions, we do consult them for guidance. *Light,* 2000 S.D. 100, ¶ 13, 615 N.W.2d at 168. Rule 9.1 of these standards provides that "[a]fter misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose."[10]

---

10.    Aggravating factors include: a) prior disciplinary offenses; b) dishonest or selfish motive; c) a pattern of misconduct; d) multiple offenses; e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; f) submission of false evidence,

(continued . . .)

[¶50.] The Referee concluded that Russell violated the Rules of Professional Conduct by failing to use his independent judgment in investigating the golf course project and by using the office of State's Attorney to enhance and defend his political career and further Schjodt's political aims. The Referee concluded that Russell's misconduct in publicizing and putting the grand jury transcript on his website and issuing a press release critical of Judge Davis warranted public censure.

[¶51.] In recommending public censure the Referee recognized that Russell's misconduct was mitigated by his lack of a prior disciplinary record, his cooperation with the Disciplinary Board, his relative inexperience in the practice of law, and his

---

(. . . continued)

false statements, or other deceptive practices during the disciplinary process; g) refusal to acknowledge wrongful nature of conduct; h) vulnerability of victim; i) substantial experience in the practice of law; j) indifference to making restitution; k) illegal conduct, including that involving the use of controlled substances. ABA Standards for Imposing Lawyer Sanctions, Rule 9.22 (1992).

Mitigating factors include: a) absence of a prior disciplinary record; b) absence of dishonest or selfish motive; c) personal or emotional problems; d) timely good faith effort to make restitution or to rectify consequences of misconduct; e) full and free disclosure to the disciplinary board or cooperative attitude toward proceedings; f) inexperience in the practice of law; g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely; (j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses. ABA Standards for Imposing Lawyer Sanctions, Rule 9.32 (1992).

willingness to concede that his conduct was improper and he made mistakes.  The Referee (and the Disciplinary Board) recommended that Russell be publicly censured.

[¶52.]     This Court has considered numerous attorney discipline cases which have resulted in public censure.  *See Dorothy,* 2000 S.D. 23, ¶ 62, 605 N.W.2d at 512 (Amundson, J., concurring) (listing and analyzing South Dakota public censure cases.)  While none of the cases involved prosecutorial misconduct they are instructive because this Court balanced misconduct with factors including admission of wrong doing, cooperation with the Disciplinary Board, a lack of prior misconduct, and the unlikelihood of recurrence.  *Id.*

[¶53.]     The release of the grand jury transcripts and the press release critical of Judge Davis was the product of a relatively inexperienced prosecutor who was caught up in the volatile political environment in Hot Springs and who allowed himself to be seduced by it.  Balanced against this, however, is that Russell immediately admitted his errors, cooperated with the Disciplinary Board, and completed an advanced legal degree.  In addition, other than this proceeding, Russell has no other disciplinary record.  Accordingly, public censure is appropriate.

[¶54.]     Russell is to pay all costs of this proceeding.  SDCL 16-19-70.2.

[¶55.]     GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.