#26430-DG

**2013 S.D. 61**

IN THE SUPREME COURT

OF THE

STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF THE

DISCIPLINE OF R. SHAWN TORNOW,

AS AN ATTORNEY AT LAW.

* * * *

ORIGINAL PROCEEDING

* * * *

ROBERT B. FRIEBERG
Disciplinary Board Counsel
Beresford, South Dakota

Attorney for Disciplinary
Board.


DARRELL A. JESSE of
Crary, Huff, Ringgenberg,
  Hartnett & Storm, P.C.
Dakota Dunes, South Dakota

Attorneys for
Respondent.


* * * *


ARGUED MAY 21, 2013

OPINION FILED **08/07/13**

#26430

GILBERTSON, Chief Justice

[¶1.]    The City Attorney for the City of Sioux Falls, David A. Pfeifle, filed a complaint with the Disciplinary Board of the State Bar of South Dakota against R. Shawn Tornow, a member of the State Bar of South Dakota. Tornow appeared at the Disciplinary Board hearing and waived his right to counsel. Following the hearing, the Disciplinary Board filed its findings of fact and conclusions of law and its recommendation that Tornow be publicly censured. This filing constitutes a formal accusation. SDCL 16-19-67.

[¶2.]    Pursuant to SDCL 16-19-68, Tornow answered the formal accusation and denied the allegations against him. This Court referred the matter to Circuit Judge Jack R. Von Wald. SDCL 16-19-68. Following a hearing where Tornow appeared pro se, Referee Von Wald filed findings of fact and conclusions of law and recommended that the matter be remanded to the Disciplinary Board for a "private reprimand and admonishment to [Tornow] by the Disciplinary Board." *See* SDCL 16-19-35(5). Tornow failed to respond to the Referee's recommendation. At oral argument before this Court, however, Tornow asked that the matter be remanded to the Disciplinary Board for a private reprimand.

## GENERAL BACKGROUND

[¶3.]    Tornow is forty-nine years old. He has been married for twenty-eight years and has an adult daughter and two teenage sons. He and his family reside in Sioux Falls.

[¶4.]    Tornow graduated from the University of South Dakota School of Law

-1-

in December 1987. In 1988, he became an Assistant Attorney General and worked in that office for over five years. After a year and a half as the full-time Deputy State's Attorney in Hughes County, Tornow worked for the Department of Social Services in the Medicaid program.

[¶5.] In 1995, Tornow became the Chief Assistant City Attorney for the City of Sioux Falls and later became an Assistant City Attorney for Sioux Falls. He was terminated from the City Attorney's Office on August 27, 2010. Tornow believes he was wrongfully discharged, has exercised his civil service appeal rights, *see Tornow v. Sioux Falls Civil Service Bd.*, 2013 S.D. 20, 827 N.W.2d 852, and served a notice of intent to bring legal action for damages against the City of Sioux Falls for § 1983 violations.

[¶6.] Tornow is currently in the private practice of law in Sioux Falls. Since his admission to practice law in South Dakota in 1988, he has had no substantiated disciplinary complaints.

## FACTS

### A

[¶7.] While Tornow began his career in the Sioux Falls City Attorney's office as the Chief Assistant City Attorney, at the time of the allegations in question he was a mid-management Assistant City Attorney. Among his responsibilities were advising city government officers and employees on city matters, enforcing city codes, prosecuting city ordinance violations, and providing legal counsel to the City's Board of Ethics. This board is comprised of citizens of Sioux Falls who are

appointed by the mayor of Sioux Falls. By city ordinance, Board of Ethics proceedings are confidential.

[¶8.]      In 2010, former Sioux Falls City Council member Kermit Staggers was running for mayor of Sioux Falls. In a March 31, 2010 e-mail to City Attorney Robert Amundson, Tornow wrote:

> Finally, please note there also is a pending nearly lock-solid violation by KS [Kermit Staggers] of Charter Sec. 2.05-prohibition of council members holding other elected office that's just come to light. That violation too could/should be investigated under the authority of the Board of Ethics, if someone might want to go there by filing or calling for a complaint/investigation. RST.

[¶9.]      On April 8, 2010, two Sioux Falls city employees filed a complaint with the Board of Ethics alleging that Staggers "possibly used confidential city information to promote his personal interests as a candidate for Mayor of the City of Sioux Falls." The employees were concerned that Staggers used his position on the City Council to obtain their confidential home addresses.

[¶10.]      The Board of Ethics investigated the complaint during April/May 2010 for possible violations of Sioux Falls city ordinance and charter provisions. During the Board of Ethics' investigation, Tornow told the board members that Staggers served as a State Republican Party precinct committeeman while serving on the City Council and violated a provision of the city charter prohibiting council members from holding other elected offices.

[¶11.]      The Board of Ethics investigated the precinct committeeman issue and ultimately reprimanded Staggers for it. This issue, however, was not the subject of

the filed complaint where the Board of Ethics found no ethics violations. The reprimand resulted in Staggers publicly castigating the Board of Ethics for what he characterized as a "fishing expedition." Staggers also repeatedly attempted to contact the chair of the Board of Ethics to discuss the reprimand. As a result, the chair of the Board of Ethics asked Tornow to talk to Staggers and explain that the matter was resolved and there would be no further contact.

[¶12.]     Tornow called Staggers at approximately 5:25 p.m. on May 18, 2010. During the course of the eight-minute conversation, the two discussed whether Tornow brought up the issue of the precinct committeeman with the Board of Ethics. Tornow told Staggers, "I didn't bring anything up." Tornow suspected that Staggers might sue the City over the ethics matter and recorded the phone conversation on the City's IT system which was routinely used by city officials who elected to record some phone conversations held in the discharge of their duties. The conversation was recorded without Staggers' knowledge.

[¶13.]     On June 17, 2010, Staggers e-mailed Tornow at 10:30 a.m., asked to "obtain a copy of the recording of our 5:30 PM, May 17th telephone conversation," and said he would pick it up the next day at the City Attorney's office. Upon receipt of Staggers' request, Tornow e-mailed Sioux Falls Mayor Mike Huether and wrote, "FYI, I just rec'd a fairly strange e-mail request from Kermit Staggers in regard to the Board of Ethics most recent dealings with him based on the complaint filed against him." Tornow told Mayor Huether that he was in a "quandary how best to respond, if at all, as Kermit apparently continues to snoop around about the ethics complaint and the BOE's (finalized) actions in response." Tornow asked to meet

-4-

with the mayor to discuss Staggers' request. Mayor Huether, however, forwarded Tornow's e-mail to City Attorney Amundson and Chief Assistant City Attorney Gail Eiesland, who had succeeded Tornow as Chief Assistant City Attorney.

[¶14.] Amundson e-mailed Tornow at 3:50 p.m. on June 17 and directed him to forward Staggers' e-mail to him and Eiesland for review. Tornow did so at 5:57 p.m. on June 17, telling Amundson that, "please keep in mind that there was no phone call to Staggers on May 17th . . . I called Kermit at approx. 5:25 pm on Tues., May 18th." Tornow told Amundson that he had "a personal copy of the phone call," and that the phone call was not a public record "based on the clear and unambiguous provisions of SDCL 1-27-1.5(12)." Tornow characterized the phone call as a "non-public phone conversation[ ]" that was "simply kept in an employee's personal record(s)." While Tornow had "absolutely nothing to hide in or during my conversation with Staggers," he did not want the conversation released for a variety of reasons.

[¶15.] The next morning, on June 18 at 9:15 a.m., Amundson e-mailed Tornow and directed him to have the phone call with Staggers transcribed. In an e-mail response at 11:43 a.m., Tornow told Amundson that, "[m]y personal record of the Staggers 8 min. phone conversation should not be turned over to KS[.]" He also informed Amundson that:

> As to an audio copy of the May 18th conversation for potential internal review purposes: it's an audio file not on the city system, however, I have a copy at home that I'll try to get into file format in order to get to media services and, if so, they should hopefully be able to transcribe it, if necessary.

#26430

[¶16.] Later on June 18, Amundson directed Eiesland to attempt to obtain a copy of the recording of the Tornow/Staggers phone conversation. At 4:45 p.m. on June 18, the City's Information Technology manager found the recording on the system's backup files. The manager believed the recording had been deleted from the City server between 1:00 a.m. and 2:00 p.m. on June 18, but could not determine who deleted it.

[¶17.] Staggers e-mailed Tornow again on Monday, June 21 at 9:30 a.m. saying he stopped to get the recording but nobody at the City Attorney's office had a copy. He asked Tornow to leave a copy of the recording at the front desk. At 7:42 p.m. that evening, Tornow e-mailed Staggers saying, "Not sure what you're attempting to dig up here—there was/is no such recording," and suggesting that Staggers contact the chair of the Board of Ethics. The next afternoon, Staggers responded, "My understanding was that in accordance with standard operating procedures important phone calls were taped. Thank you for clarifying the issue with our phone call."

[¶18.] The City hired an outside investigator, attorney Cheryle Wiedmeier Gering,[1] to conduct a workplace investigation of Tornow's possible dishonesty and deception in the Staggers matter.[2] In the course of the investigation, Gering asked Tornow if he raised the precinct committeeman issue with the Board of Ethics:

> Mr. Tornow stated that he "may have" in response to an inquiry from a Board of Ethics Committee member as to what

---

1. This work was undertaken by Gering prior to her being sworn in as a circuit judge for the First Judicial Circuit on July 1, 2011.

2. The workplace investigation report, found in Exhibit 5, is a part of the record before the Disciplinary Board.

> ordinances they needed to be looking at as they reviewed the ethics complaint involving Mr. Staggers. Mr. Tornow went on to say that if he did, he may have "overstepped."

[¶19.]     The investigation also revealed that Tornow recorded the May 18, 2010 conversation on his office phone system. After receiving Staggers' request for a copy of a May 17th recording of "our 5:30 p.m., May 17th telephone conversation," Tornow played back the May 18th conversation and recorded it on his personal hand-held digital recorder. He then deleted this recording from the City's phone system.

[¶20.]     The investigator's report detailed Tornow's reasons for deleting the recording:

> [Tornow's] system had a large number of saved messages/ recordings on it (there is a maximum number that can be saved/recorded); the recording was about a confidential Board of Ethics (BOE) matter; the recording was not a public record pursuant to state law (SDCL 1-27-1.5(12)); he believed that Mr. Staggers would use the mere fact that the conversation had been recorded against the City Attorney's Office and the BOE; Mr. McKnight's [the chair of the Board of Ethics] strong feelings expressed to Mr. Tornow that the recording should not be given to Kermit Staggers (note that Mr. McKnight did <u>not</u> tell Mr. Tornow to delete the recording); and Mr. Tornow was protecting his client (the Board of Ethics) and himself by deleting the recording from the City phone system in the event that a subpoena request was received for the recording.

[¶21.]     The investigator concluded that Tornow knew what conversation Staggers was asking for, but did not tell Staggers that he had the wrong date:

> According to Mr. Tornow, when he told Mr. Staggers there "was/is no recording," he was "word-smithing" his response to Kermit Staggers as Mr. Staggers' e-mails inquired about a "May 17th" conversation and there is no recording of a May 17th conversation as there was no conversation between Staggers and Tornow on that date.

[¶22.]     Shortly after Tornow was relieved of his duties in the City Attorney's office, Staggers threatened a lawsuit against the Board of Ethics and the City. The recording would have been a part of the evidence in that proceeding. The matter was settled. Staggers also filed a complaint with the State Open Meetings Commission which found that the Board of Ethics violated state open meetings law and issued a public reprimand.

B

[¶23.]     In March 2009, Tornow's 20-year-old daughter, Megan, was cited by a Sioux Falls police officer for a state no seat belt violation and a city speeding in a school zone violation. Because of Tornow's position in the City Attorney's office, the prosecution was handled by the Minnehaha County State's Attorney's office. The City Attorney's office had a long-standing practice with the State's Attorney that the State's Attorney would prosecute cases in which the City had a conflict.

[¶24.]     Megan was represented by attorney Dan Brendtro. On the eve of trial, Brendtro called Tornow at home and asked him if there was a joint powers agreement between the State's Attorney's office and the City Attorney's office that allowed prosecution in Megan's case. Tornow told Brendtro that there was no joint powers agreement allowing the State's Attorney to prosecute a city citation.

[¶25.]     At a June 12, 2009 appearance in magistrate court, Brendtro moved to dismiss Megan's case because the State's Attorney lacked the jurisdiction to prosecute. The motion was granted without prejudice.

[¶26.]     A deputy state's attorney notified Chief Assistant City Attorney Eiesland of the dismissal and told her that Brendtro received advice concerning the

motion from someone in the City Attorney's office. When questioned by Eiesland, Brendtro told her that he had spoken with Tornow.

[¶27.] Tornow admitted speaking to Brendtro about the jurisdictional issue and claimed he was obligated to do so pursuant to Rule 3.3 of the South Dakota Rules of Professional Conduct.[3]

[¶28.] After the dismissal of Megan's citations, she was recharged with violations of state law. Following her conviction, Tornow represented her on appeal to the circuit court. In his appellant's brief, Tornow alleged that the case was a "strangely mishandled traffic case" involving "this bungled state prosecution." Tornow submitted that the State "improperly filed its June 23d complaint as a factually retaliatory measure against [Megan Tornow]." Tornow referred to the "State's ignorance or obfuscation" of statutory requirements, the "State's feeble attempt to cover their mistaken charge," and the "State's concocted careless driving charge." Tornow also wrote:

> Unfortunately, this retaliatory prosecution effort was further bolstered by Magistrate Sage as a part of his review of the case when he astonishingly complained and/or criticized on the record that:
>
> > "The more despicable thing to me is we all know who this is and . . . I think this is pretty despicable on Mr. Tornow's part, if that's the case. It was charged [as] a city offense to start with and then you end up in state court and fight it . . . ."

### DISCIPLINARY BOARD

[¶29.] In its findings of fact, the Disciplinary Board, in addition to entering findings on the Staggers and Megan Tornow matters, found:

---

3. Rule 3.3 deals with a lawyer's candor toward the tribunal.

34. [Tornow's] written responses to the Board deny any rule violations on his part. He claims Pfeifle's complaint was made for the purpose of ". . . bolster[ing] their discriminatory and pretextual personnel action through their discharge of my employment." [Tornow] states further, ". . . this complaint was submitted as an improper attempt to bolster the City's lack of just cause for its discriminatory and pretextual discriminatory action on August 27."

35. [Tornow's] frequent requests to delay the Board's investigation because of [Tornow's] inability to obtain evidence necessary to support his reply to the complaint [were] pretextual.

36. [Tornow's] misconduct constitutes violations of the Rules of Professional Conduct and has been prejudicial to the administration of justice in bringing into question the fairness of the justice system.

[¶30.] The Disciplinary Board concluded:

A. [Tornow] has violated the Rules of Professional Conduct: Rule 1.7 concerning conflicts of interest; Rule 3.4 concerning fairness; Rule 4.1 concerning truthfulness; Rule 4.4 concerning rights of third persons; and Rule 8.4 (a) (c) and (d) concerning professional misconduct.

B. [Tornow's] misconduct is aggravated by the following:

i. [Tornow's] dishonest or selfish motive;
ii. [Tornow's] multiple offenses;
iii. [Tornow's] deceptive requests for delay in the Board's investigation;
iv. [Tornow's] position as a public official;
v. [Tornow's] substantial experience in the practice of law; and
vi. [Tornow's] failure to fully acknowledge the extent of his misconduct.

[¶31.] The Disciplinary Board recommended that Tornow be publicly censured.

REFEREE

[¶32.]     Following the hearing before the Referee, the Disciplinary Board and Tornow submitted proposed findings of fact and conclusions of law and a recommendation to the Referee.  The Disciplinary Board proposed that the Referee recommend "[Tornow] be publicly censured."  Tornow proposed that the Referee recommend, "If any discipline may be necessary to protect the public in this matter and is not intended to punish [Tornow], this matter should be remanded to the South Dakota Disciplinary Board for a private and confidential letter of admonishment to [Tornow]."

[¶33.]     In recommending that the matter be remanded to the Disciplinary Board for a private reprimand and admonishment, the Referee concluded:

> 1.     [Tornow] has violated the Rules of Professional Conduct, specifically Rule 1.7, dealing with conflicts of interest. The Rule provides:
>
>     (a)     Except as provided in paragraph (b), a lawyer shall not represent a client if their representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if . . .
>
>         (2) There is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person <u>or by a personal interest of the lawyer</u>. (Emphasis Original.)
>
> 2.     [Tornow] has violated Rule of Professional Conduct No. 3.4, fairness to opposing party and counsel.
>
> 3.     [Tornow] has violated Rule of Professional Conduct No. 4.1 concerning truthfulness in statements to others. Misrepresentations can occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements.

4.     [Tornow] has violated Rule of Professional Conduct No. 8.4 (a), (c) and (d) concerning professional misconduct.

[¶34.]     In mitigation, the Referee concluded:

5.     [Tornow] has had a legal career of almost 25 years and has had no substantiated disciplinary complaint prior to the current complaint.

## STANDARD OF REVIEW

[¶35.]     The Court gives careful consideration to the findings of the Disciplinary Board because it has had the opportunity to see and hear the witnesses. *In re Discipline of Reynolds*, 2009 S.D. 9, ¶ 48, 762 N.W.2d 341, 352. However, we do not defer to the Board's recommended sanction. *Id.* While this Court also gives careful consideration to a referee's findings, it gives no particular deference to a referee's recommended sanction. *In re Discipline of Russell*, 2011 S.D. 17, ¶ 31, 797 N.W.2d 77, 85. "The final determination for the appropriate discipline of a member of the State Bar rests firmly with the wisdom of this Court." *In re Discipline of Wehde*, 517 N.W.2d 132, 133 (S.D. 1994). This is because this Court is ultimately charged with the obligation to protect the public through the regulation of the Bar. S.D. Const. art. V, § 12.

## DISCIPLINARY GOALS

[¶36.]     Attorneys must possess good moral character to practice law in South Dakota. SDCL 16-16-2. The term good moral character includes, but is not limited to, the qualities of "honesty, candor, trustworthiness, diligence, reliability, observance of fiduciary and financial responsibility, and respect for the rights of

others and for the judicial process." SDCL 16-16-2.1. Attorneys admitted to the practice of law have a continual and on-going obligation to meet these requirements on a daily basis. *Reynolds,* 2009 S.D. 9, ¶ 51, 762 N.W.2d 341 at 352-53.

[¶37.] An attorney's certificate of admission to the South Dakota bar "authorizes its possessor to assume full control of the important affairs of others and to guide and safeguard them when, without such assistance, they would be helpless." *In re Egan* (Egan II) 52 S.D. 394, 402, 218 N.W. 1, 4 (1928) (quoting *In re Kerl*, 32 Idaho 737, 738, 188 P. 40, 41 (1920)). As a condition for the privilege to practice law, an attorney must act "both professionally and personally, in conformity with the standards imposed upon members of the bar . . . ." SDCL 16-19-31.

[¶38.] The Supreme Court has "inherent power to supervise the conduct of attorneys who are its officers," SDCL 16-19-20, and the affirmative duty to govern the discipline of members of the bar. S.D. Const. art. V, § 12. A license to practice law in South Dakota "is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice[.]" SDCL 16-19-31. These are obligations that this Court takes "most seriously." *Russell*, 2009 S.D. 9, ¶ 49, 762 N.W.2d at 352.

[¶39.] In *In re Discipline of Ortner*, 2005 S.D. 83, ¶ 27, 699 N.W.2d 865, 874, we noted:

> The purpose of the disciplinary process is to protect the public from fraudulent, unethical or incompetent practices by attorneys. *Matter of Discipline of Kallenberger*, 493 N.W.2d 709 (S.D. 1992). It is also intended to deter like conduct by other attorneys. *In re Discipline of Eicher*, 2003 S.D. 40, 661 N.W.2d

354. The disciplinary process is not conducted to punish the lawyer. *Petition of Pier*, 1997 S.D. 23, 561 N.W.2d 297.

> The preservation of trust in the legal professional is essential. *Pier*, 1997 S.D. 23 at ¶ 8, 561 N.W.2d at 299. Lawyers in the practice of law have a formidable responsibility to protect their clients' "property, their freedom, and at times their very lives." *Matter of Chamley*, 349 N.W.2d 56, 58 (S.D. 1984). "Only by providing high quality lawyering can the integrity of the legal profession remain inveterate and the confidence of the public and the Bar remain strong." *Wehde*, 517 N.W.2d at 133.

*In re Discipline of Mattson*, 2002 S.D. 112, ¶ 40, 651 N.W.2d 278, 286.

[¶40.] In *Ortner*, supra, and other disciplinary cases we have noted that the disciplinary process is not intended to punish the lawyer. This statement had its genesis in *In re Egan (Egan I)*, 36 S.D. 228, 154 N.W. 521 (1915). This Court distinguished criminal proceedings and disbarment proceedings:

> Statutes, text-writers, and courts speak of certain misconduct of attorneys as being "grounds for" disbarment. Such use of the term "grounds for" is misleading and tends to the conclusion that it is in fact, *for* the "misconduct" that the attorney is disbarred. To disbar *for an act* savors of punishment and would ally a disbarment proceeding to a criminal proceeding, to which proceeding a disbarment proceeding has, in fact, no relation. In only one sense is such use of the term "grounds for" correct, and that is as stating that the misconduct *furnishes the proof* of the wrongdoer's present unfitness to hold a license as an attorney at law; but it is such "unfitness" which in every case is the real "ground for" disbarment. As said by every court in Ex parte Tyler, 107 Cal, 78, 40 Pac. 33, when speaking of the power to disbar, the italicizing being ours:
>
> > "In the exercise of this power the court deals with the attorney only as an officer of the court in investigating charges against him for the purpose of determining whether, under the proofs, *he is a fit person to be allowed to continue to practice as an attorney and counselor* in the courts under the license which has been granted to him,

> and not for the purpose of judging whether *he is guilty of a crime for which he ought to be convicted and punished.*"

*Egan I*, 36 S.D. at 233, 154 N.W. at 522-523. The Court further noted that:

> Our statutes (section 704, P.C.) prescribe that certain things "are sufficient causes for revocation or suspension," but such section certainly does not make it mandatory upon the court to disbar or suspend an attorney against whom one or more of the "causes" may be proven, if from the whole evidence the court should be satisfied that at the time of such disbarment proceeding the attorney was a person of good moral character and fitted to remain an attorney; neither does such statute prescribe the limits beyond which a court is forbidden to go in investigating the alleged unfitness of an attorney to retain his license. This distinction must be borne in mind: The law *punishes* one for what he *does*, not for what he *is*, while an attorney is disbarred because of what he *is* as proven, as of course it only could be proven, by what he *has done*. It is this that fundamentally differentiates a disbarment proceeding from a criminal prosecution, and proves the correctness of the holding that a disbarment proceeding is purely civil in its nature. State v. Kirby, 154 N.W. 284, decided at this term. A person is licensed to practice as an attorney when, in the method established by law, he has been found to be fitted to serve as such attorney; he is suspended or disbarred when it is adjudged that he is unfitted so to serve. The public seeks redress, through a criminal action, for a wrong done it by one acting as an attorney at law; it seeks protection from further wrong on the part of such attorney through the purely civil proceeding wherein it seeks his disbarment. Proof of misconduct, punishment for which may be barred by statute, may often, especially in connection with proof of other misconduct of more recent date, tend to prove present unfitness or moral delinquency. It is unnecessary to the materiality of proof of certain misconduct that such proof, standing alone, would be insufficient to establish the unfitness of the wrongdoer to be a licensed attorney; the ultimate question being: Do all the facts established by the evidence prove to the satisfaction of the court that the respondent is unfitted to be an attorney at law?

*Egan I*, 36 S.D. at 233-234, 154 N.W. at 523.

[¶41.]     With these principles in mind, we turn to the issues raised in Tornow's

case.

## LEGAL ANALYSIS

### A

[¶42.]    Every person who has the privilege to practice law has the responsibility to strive for being:

> A person of unquestionable integrity as he or she deals with the rights of people before the bar.  A practitioner of the legal profession does not have the liberty to flirt with the idea that the end justifies the means, or any other rationalization that would excuse less than complete honesty in the practice of the profession.  Certainly our Rules of Professional Conduct allow no such flirtation.

*In re Discipline of Mines*, 523 N.W.2d 424, 427 (S.D. 1994).

[¶43.]    In his representation of the Board of Ethics investigating a written complaint against Staggers, Tornow informed the board that Staggers was a committee precinctman, told Staggers that he did not bring up this issue to the board, and admitted to Investigator Gering that he may have overstepped if he did bring it up.  In addition, when Staggers asked for a copy of their May 17th phone conversation, Tornow said there "was/is no such recording," knowing that the conversation took place on May 18th and there was a recording.  When his supervisor, City Attorney Amundson, asked for a transcript of the Staggers phone conversation, Tornow described it as a "personal record" that was "not on the city system."  He also told Amundson that the recorded phone conversation was a "personal copy" of a "non-public phone conversation" that he kept "in an employee's personal records."  It is clear, however, that Tornow obtained the recording in his public capacity and not in a personal capacity outside the scope of his employment.

[¶44.] Tornow's repeated parsing of words and terms—"word-smithing" in his own words—amounts to misrepresentation and is a clear violation of the Rules of Professional Conduct. It is professional misconduct for a lawyer to violate these rules and engage in conduct involving dishonesty, fraud, deceit or misrepresentation. Rule 8.4(a); Rule 8.4(c). When representing a client, "a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person[.]" Rule 4.1. Misrepresentation can occur by "partially true but misleading statements or omissions that are the equivalent of affirmative false statements." Comment, Rule 4.1.

[¶45.] An attorney must be "fully honest and forthright." *In re Discipline of Wilka*, 2001 S.D. 148, ¶ 15, 638 N.W.2d 245, 249. In addition, an attorney has an obligation to use only truthful means. SDCL 16-18-19. Candor goes beyond telling a portion of the truth. *In re Discipline of Eicher*, 2003 S.D. 40, ¶ 34, 661 N.W.2d 354, 365.

B

[¶46.] After Staggers requested a copy of the phone recording, Mayor Huether forwarded Tornow's request for guidance to Amundson, and Amundson began questioning Tornow about the recording, Tornow transferred the recording to his personal hand-held device and deleted it from the City's IT system.

[¶47.] This deletion violated a city policy prohibiting an employee copying data contained on city hardware or software to a portable storage device for personal use without proper authorization. It also violated Rule 3.4 of the Rules of

Professional Conduct:

> A lawyer shall not:
>
> (a)  unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value.

This section "applies to evidentiary material generally, including computerized information." *Id*.

> Subject to evidentiary privileges, the right of an opposing party, including the government, to obtain evidence through discovery or subpoena is an important procedural right. The exercise of that right can be frustrated if relevant material is altered, concealed or destroyed.

Comment, Rule 3.4

[¶48.]    Tornow's deletion of the recording from the City's system after Staggers' request clearly indicates that he wanted to evade production of that recording. More importantly, however, is Tornow's admission to Investigator Gering and, later, City Attorney Pfeifle that he was protecting the Board of Ethics and himself in the event that the recording was subpoenaed. According to Pfeifle:

> Beyond the clear violation of the Rules and negative impact on the judicial system as a whole, Tornow's actions would have shattered the public confidence in the CAO [City Attorney's Office] almost beyond repair had Tornow's attempted destruction of evidence surfaced as part of any litigation commenced by Staggers.

C

[¶49.]    Tornow was aware that the Minnehaha County State's Attorney's office prosecutes City Attorney's office conflict cases and does so as a professional courtesy. A few weeks before his daughter was cited for traffic violations by a City police officer, Tornow was also a part of a City Attorney's office discussion regarding

the jurisdictional issue raised by a joint City and Lincoln County prosecution. Tornow discussed the jurisdictional issue with Brendtro, his daughter's retained attorney. As a result, Brendtro moved to dismiss because the state's attorney lacked jurisdiction to prosecute. The motion was granted without prejudice.

[¶50.] The Disciplinary Board and the Referee concluded that Tornow's legal advice to his daughter's attorney violated Rule 1.7(a)(2). That rule provides, in part,

> Except as provided by paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> ***
>
> (2)   there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

[¶51.] At oral argument, Tornow's counsel argued that there was no violation of this rule because there must be more than one client for a violation. The rule, however, is not limited to concurrent conflicts of interest between one or more clients. It includes "another client, a former client or third person or by a personal interest of the lawyer." In this case the conflict of interest was between Tornow's client, the City of Sioux Falls, and Tornow's personal interest in his daughter's case.

[¶52.] "Loyalty and independent judgment are essential elements in a lawyer's relationship to a client." Comment, Rule 1.7. Tornow's client for approximately 16 years and during the timeframe of this case was the City of Sioux Falls. On the eve of his daughter's trial, however, Tornow allowed his family relationship to "interfere with both loyalty and independent professional judgment."

Comment, Rule 1.7 [11]. Tornow gave legal advice, based on information obtained in his representation of the City, to his daughter's attorney who was representing her on a city charge. By doing so, Tornow violated Rule 1.8(b):

> A lawyer shall not use information relating to the representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.

"The attorney is in effect a special agent limited in duty to the vigilant prosecution and defense of the rights of the client and not to bargain or contract them away." *Eicher*, 2003 S.D. 40, ¶ 32, 661 N.W.2d 354, 365 (quoting *NW. Realty Co. v. Perez*, 80 S.D. 62, 65, 119 N.W.2d 114, 116 (1963)). Here, Tornow did not have the City's permission to divulge City information to Brendtro.

D

[¶53.]     Following his daughter's conviction, Tornow represented her on appeal. In his brief to the circuit court, Tornow inserted disrespectful and insulting invectives directed at the magistrate judge and prosecutor.

[¶54.]     "It is the duty of an attorney and counselor at law to maintain the respect due to the courts of justice and judicial officers." SDCL 16-18-13.

> A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

Preamble, South Dakota Rules of Professional Conduct. SDCL ch. 16-18, Appx.

[¶55.]     In *Credit Management Service v. Wendbourne*, 76 S.D. 80, 82, 72 N.W.2d 926, 926-27 (1955), this Court reprimanded an attorney for injecting an unwarranted attack on the trial judge in the appellant's brief.

> A brief in no case can be used as a vehicle for the conveyance of hatred, contempt, insult, disrespect or professional discourtesy of any nature for the court of review, trial judge, or opposing counsel; invectives are not argument, and have no place in legal discussion, but tend only to produce prejudice and discord.
>
> The practice of inserting in briefs language which tends to bring ridicule on the trial judge or jury or which impugns their motives and conduct, is considered a very reprehensible one and deserving of the strongest censure, and statements objectionable in this regard will not be considered.

4 C.J.S., *Appeal and Error*, § 734 (2007) (footnotes omitted).  Tornow's language in the appellate brief in his daughter's case went far beyond acceptable reasoned legal discourse.

APPROPRIATE DISCIPLINE

[¶56.]     The appropriate discipline in a case depends on the seriousness of the misconduct by the attorney, the likelihood of repeated instances of similar misconduct, and the prior record of the attorney.  *Russell*, 2011 S.D. 17, ¶ 47, 797 N.W.2d at 89.

[¶57.]     Misconduct is grounds for attorney discipline and includes the willful violation of any of the duties of an attorney or counselor as prescribed in SDCL chapter 16-18.  SDCL 16-19-33(3).  SDCL 16-19-35 provides:

Misconduct shall be grounds for:

(1)     Disbarment *by the Supreme Court*;

(2)     Suspension *by the Supreme Court* for an appropriate fixed period of time, or for an appropriate fixed period of time

and an indefinite period concurrently or thereafter to be determined by the condition imposed by the judgment. No suspension shall be ordered for a specific period in excess of three years;

(3)     Placement on a probationary status *by the Supreme Court* for a stated period, or until further order of the court, with such conditions as the court may specify;

(4)     Public censure *by the Supreme Court*; or

(5)     Private reprimand *by the Disciplinary Board*.

(Emphasis added.)

[¶58.]     In this case, the Disciplinary Board recommended that the Supreme Court publicly censure Tornow. SDCL 16-19-35(4). The referee recommended that the Court remand the matter to the Disciplinary Board for "a private reprimand and admonishment" by the Disciplinary Board.

[¶59.]     The Referee is recommending a hybrid form of discipline. An admonishment is not an authorized form of discipline for misconduct. *See* SDCL 16-19-35. Rather, it is a finding by the Disciplinary Board that a rule violation occurred, but there was no harm to a client greater than de minimus. *In re Discipline of Laprath*, 2003 S.D. 114, ¶ 8, 670 N.W.2d 41, 46. A private reprimand is a finding of a serious rule violation resulting in harm to a client, or an intentional, serious rule violation. *Id*. If the Disciplinary Board determines that a private reprimand is warranted and the accused attorney accedes, the Disciplinary Board's report to the Supreme Court constitutes a private reprimand, SDCL 16-19-62, and the matter remains confidential. SDCL 16-19-99. In Tornow's case, however, formal disciplinary proceedings were instituted, SDCL 16-19-68, and the matter became public, SDCL 16-19-99.

[¶60.] Tornow has practiced law for twenty-five years and has had no substantiated disciplinary complaints prior to the current complaint. Tornow spent the early years of his career as a prosecutor in the Attorney General's office and the latter sixteen years of his career representing the City of Sioux Falls and prosecuting violations of its ordinances. As a public sector lawyer and prosecutor, Tornow was vested with powers that a lawyer in private practice does not have. Tornow was a minister of justice obligated to guard the rights of the accused, enforce the rights of the public, and see that justice was done without employing improper methods. *Russell*, 2011 S.D. 17, ¶ 41, 797 N.W.2d at 87

[¶61.] Tornow is not a novice to the legal profession. He is a seasoned attorney in a position of public trust. Tornow misled and made misrepresentations to those he dealt with in an official capacity. He attempted to conceal a recording that he knew had evidentiary value to protect himself. He used information received in the course of his official capacity to work against the interests of his client which happened to be a public entity. He allowed a family relationship to interfere with his loyalty to his client and cloud his legal judgment. He wrote an appellate brief that disparaged a judge and the prosecutor.

[¶62.] These acts were not isolated, foolish, negligent or done in the heat of trial; they were intentional and numerous. *Mattson*, 2002 S.D. 112, ¶ 55, 651 N.W.2d 278, 289. With all of the incidents, Tornow had sufficient time to reflect before engaging in conduct that was personally and professionally offensive and flagrantly disrespectful. *Eicher*, 2003 S.D. 40, ¶ 29, 661 N.W.2d 354, 364. While he has attempted to minimize his conduct and its effects, he failed to use the law's

procedures for legitimate purposes and demonstrated a lack of respect for the legal system and those who serve it. *See* SDCL 16-18-13; SDCL 16-18-14; Preamble, South Dakota Rules of Professional Conduct. SDCL 16-18 Appx.

[¶63.] While his removal from the City Attorney's Office in the short term could cause one to conclude the risk of such future misconduct is slight, our scope of review is broader than that--it is for the future protection of the public from all members of the bar who are tempted to engage in such misconduct. This stems from our duty to protect the public that not only includes future protection from the attorney now before us, but extends to each and every member of the Bar in South Dakota. Sadly we do not write on a clean slate. We have faced this issue all too frequently where lawyers play fast and loose with the  truth and obligation of candor whether one calls it "word-smithing" or something else. The same can be said for abuse of the powers that come with the privilege of the practice of law. *See Russell*, 2011 S.D. 17, 797 N.W.2d 77; *Wilka*, 2001 S.D. 148, 638 N.W.2d 245; *In re Discipline of Dorothy*, 2000 S.D. 23, 605 N.W.2d 493; *In re Discipline of Light*, 2000 S.D. 100, 615 N.W.2d 164; *In re Discipline of Claggett*, 1996 S.D. 21, 544 N.W.2d 878; *Mines*, 523 N.W.2d 424; *In the Discipline of Bihlmeyer*, 515 N.W.2d 236, (S.D. 1994); *In re Discipline of Taylor*, 498 N.W.2d 200 (S.D. 1993); *In re Discipline of Schmidt*, 491 N.W.2d 754 (S.D. 1992).

[¶64.] We are not bound by the recommendations of the Disciplinary Board or the Referee although we give them the careful examination they deserve. Here they are not the same. In the end we are charged with the exercise of our independent judgment for the protection of the public.

[¶65.]     Tornow's conduct in this case, combined with his lack of respect for the legal system, his attack on a judge who sat on his daughter's case in which he participated, and his minimization of his conduct, cannot be overcome by his prior lack of complaints.  While a prior record free of such misconduct is obviously a goal of any attorney, the ethical requirements of an attorney must be met each day. "Note that this is a continual and on-going obligation.  Each day of an attorney's life demands that these requirements be met anew." *Eicher*, 2003 S.D. 40 at ¶ 25, 661 N.W.2d at 363, (quoting *In re Ogilvie*, 2001 S.D. 29, ¶ 56, 623 N.W.2d 55, 67 (Gilbertson, J., dissenting)).  The public is not protected from future misconduct by the unrepentant.  *Ortner*, 2005 S.D. 83, ¶ 27, 699 N.W.2d 865; *In re Discipline of Arendt*, 2004 S.D. 83, 684 N.W.2d 79; *Eicher*, 2003 S.D. 40, 661 N.W.2d 354; *Wilka*, 2001 S.D. 148, ¶ 13, 638 N.W.2d 245.  This conduct falls well short of our mandate under SDCL 16-19-31 that we as Justices of this Court, certify to the public that Tornow is "fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court."

[¶66.]     Tornow's conduct was of a serious professional nature.  It is in the best interests of the public and the legal profession that it warrants his public censure by this Court.  He shall be taxed and required to pay, allowable costs and expenses as provided by SDCL 16-19-70.2.

[¶67.]     SEVERSON and WILBUR, Justices, concur.

[¶68.]     KONENKAMP and ZINTER, Justices, concur with a writing.

KONENKAMP, Justice (concurring specially).

[¶69.]     I fully concur with the Court's conclusions on Tornow's ethical violations and his equivocal acknowledgment of responsibility.  I also concur with the discipline the Court imposes.  I write to advocate for a consistent and uniform system for applying disciplinary measures in harmony with our often-stated goals of (1) protecting the public, (2) deterring like conduct by other attorneys, and (3) maintaining professional ethics.  *See In re Discipline of Mattson*, 2002 S.D. 112, ¶ 39, 651 N.W.2d 278, 286.  Such a system already exists: the ABA Standards for Imposing Lawyer Sanctions.  Other states use the ABA Standards or have adapted them to their particular needs.  We have often referred to these Standards in our previous disciplinary cases but have not endorsed them for consistent use.[4]  *See, e.g.*, *In re Discipline of Light*, 2000 S.D. 100, ¶ 13, 615 N.W.2d 164, 168 (citing ABA Standards for Imposing Lawyer Sanctions); *In re Discipline of Claggett*, 1996 S.D. 21, ¶ 16, 544 N.W.2d 878, 881 (same).

[¶70.]     Our constitution requires us to oversee the admission and discipline of lawyers.  S.D. Const. art. V, § 12.  As part of this duty, we should impose discipline evenhandedly and consistently.  Otherwise, we "cast doubt on the efficiency and the basic fairness of all disciplinary systems."  *See* ABA Standards for Imposing Lawyer Sanctions, Preface (1991) (in Westlaw as ABA-SILS Preface).  If sanctions are too lenient, future conduct will not be deterred, and the public will lose confidence in

---

4.      *See* William A. Williams, *The Whole is Greater Than the Sum of the Parts: The Discipline of Benjamin J. Eicher, Attorney at Law*, 49 S.D. L. Rev. 373, 395 n.182 (2004) (noting that although in certain cases we have used the Standards for guidance, we have "not adopted or implemented" them).

our legal system. If sanctions are too severe, lawyers might be reluctant to report misconduct, again causing lower public confidence in our system. *See id.*

[¶71.] To achieve the degree of consistency necessary for fairness to the public and the bar, along with reliability and trust in our disciplinary process, the ABA Standards for Imposing Lawyer Sanctions should be used regularly as discretionary guidelines.[5] At the very least, the Standards provide a helpful listing of essential considerations. They will aid referees appointed to adjudicate and recommend discipline to this Court. And, if they are not already being used, the Standards will assist our Disciplinary Board with its functions, including private disciplinary actions, which never come before this Court.[6] Furthermore, as an increasing number of lawyers practice in multiple states, these Standards allow for consistency in imposing disciplinary sanctions for the same or similar offenses within and among jurisdictions.

[¶72.] When imposing sanctions for misconduct, the Standards begin by asking the following questions:

> (1) What ethical duty did the lawyer violate? (A duty to a client, the public, the legal system, or the profession?)
>
> (2) What was the lawyer's mental state? (Did the lawyer act intentionally, knowingly, or negligently?)

---

5.  *See* Sarah A. Hirsch, *The Illusive Consistency: A Case for Adopting the ABA Standards for Imposing Lawyer Sanctions in In re Martin,* 40 S.D. L. Rev. 300 (1995).

6.  Disciplinary boards in some states use the ABA Standards even when the courts do not. Levin, *The Emperor's Clothes and Other Tales About the Standards for Imposing Lawyer Discipline Sanctions,* 48 Am. U. L. Rev. 1, 34, n.157 (1998).

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct? (Was there a serious or potentially serious injury?)[.]

ABA-SILS Framework; *see also Light,* 2000 S.D. 100, ¶ 13, 615 N.W.2d at 168.

[¶73.]        We ordinarily start with the notion that the most important ethical duties are those owed to the client, which are the duties of loyalty, diligence, competence, and candor.  But a lawyer also owes a duty to the general public and the legal system to abide by the rules in the administration of justice.  And a lawyer owes a duty to the legal profession, related to fees, the practice, and the integrity of the profession.  *See* ABA-SILS Framework.

[¶74.]        In assessing the lawyer's mental state, the Standards focus on culpability.  What was the lawyer's conscious objective or purpose in accomplishing a particular result?  The most culpable state is acting with intent, next with knowledge, and lastly, and least culpable, with negligence.  *Id.*

[¶75.]        When assessing the extent of injury, "injury" is defined as "harm to a client, the public, the legal system, or the profession" from the lawyer's misconduct.  ABA-SILS Definitions.  Injury is measured in reference to the specific duty violated and examined against the extent of actual or potential harm.  There can be serious injury, injury, or little to no injury.  *Id.*

[¶76.]        After answering the first three questions, the Standards then move to any aggravating or mitigating circumstances in guiding which sanction to impose.  These circumstances relate, not to the offense at issue, but to matters relevant to fitness to practice law or to matters arising during the disciplinary proceedings.  ABA-SILS Standard 9.1.  Aggravating factors include: "(a) prior disciplinary

offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge the wrongful nature of the conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; and (k) illegal conduct, including that involving the use of controlled substances." ABA-SILS Standard 9.2.

[¶77.]     Mitigating factors include: "(a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when:

> (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;
>
> (2) the chemical dependency or mental disability caused the misconduct;
>
> (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and
>
> (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in disciplinary proceedings; (k) imposition of other penalties or sanctions; (l) remorse; (m) remoteness of prior offenses." ABA-SILS Standard 9.3.

[¶78.] Using the ABA Standards for Imposing Lawyer Sanctions as a framework can forestall the hazard of merely subjective discipline. As another court noted, "[o]ur review is often hampered by the absence of a clear explanation of the reasons for selecting a particular sanction. Reference to the ABA Standards will lead to well-reasoned decisions that will facilitate meaningful review." *Grievance Adm'r v. Lopatin,* 612 N.W.2d 120, 128 (Mich. 2000). Of course, the Standards will not answer every question that may arise in a disciplinary proceeding, but their regular use as guidelines can add a greater measure of uniformity and consistency to South Dakota's vital interest in maintaining the highest ethical standards for its lawyers.

ZINTER, Justice (concurring).

[¶79.] I join the opinion of the Court. I also agree with Justice Konenkamp's observation that the ABA Standards for Imposing Lawyer Sanctions provide a helpful, discretionary framework for analysis in this and other discipline cases. Although we have not adopted those standards, we have referred to them for guidance in numerous decisions of this Court. *See In re Discipline of Russell*, 2011 S.D. 17, ¶ 49, 797 N.W.2d 77, 90; *In re Discipline of Janklow*, 2006 S.D. 3, ¶ 18, 709 N.W.2d 28, 34-35; *In re Discipline of Ortner*, 2005 S.D. 83, ¶ 49 n.6, 699 N.W.2d 865, 880 n.6; *In re Discipline of Laprath*, 2003 S.D. 114, ¶ 86 n.4, 670 N.W.2d 41, 66 n.4; *In re Discipline of Mattson*, 2002 S.D. 112, ¶ 57, 651 N.W.2d 278, 290; *In re Discipline of Light*, 2000 S.D. 100, ¶ 17, 615 N.W.2d 164, 168-69; *In re Pier*, 1997

S.D. 23, ¶ 8, 561 N.W.2d 297, 299; *In re Discipline of Claggett*, 1996 S.D. 21, ¶ 16, 544 N.W.2d 878, 881.